**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOHN A. ARETAKIS,

Plaintiff,

- v -                                              Civ. No. 1:07-CV-1273
                                                          (RFT)[1]

ROBERT DURIVAGE, TIMOTHY NUGENT, TOWN
OF NORTH GREENBUSH, and ROBERT D. WELLS,

Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

JOHN A. ARETAKIS, ESQ.
*Pro Se Plaintiff*
353 East 54th Street
New York, New York 10022-4965

MURPHY, BURNS LAW FIRM                    THOMAS K. MURPHY, ESQ.
*Attorney for Defendants Durivage and Town of North Greenbush*
226 Great Oaks Blvd.
Albany, New York 12203

NAPIERSKI, VANDENBURGH LAW FIRM          THOMAS J. O'CONNOR, ESQ.
*Attorney for Defendant Timothy Nugent*
296 Washington Avenue Extension
Albany, New York 12203

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**MEMORANDUM-DECISION and ORDER**

**TABLE OF CONTENTS**

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-11

    A. September 6, 2005 Incident  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-7

        1. Robert Wells's "Abbreviated" Version of the Events . . . . . . . . . . . . . . . . . . 5-6

---

[1] Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have a United States Magistrate conduct any and all proceedings in this case, Dkt. No. 43, which consent was approved by the Honorable Lawrence E. Kahn, Senior United States District Judge, on March 17, 2008, Dkt. No. 55.

2. John Aretakis's "Abbreviated" Version of the Events . . . . . . . . . . . . . . . . 6-7

B. Town of North Greenbush Police Department Investigation . . . . . . . . . . . . . . . . 7-9

C. Appointment of the Special Prosecutor and the Criminal Trial . . . . . . . . . . . . . . 9-10

D. Commencement of this Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

II.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-66

A. Motion to Dismiss Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

B. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

C. False Arrest, Malicious Prosecution, and Constitutional Violations . . . . . . . . . 15-29

1. False Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

2. Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-26

3. Malicious Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-29

D. Intentional Infliction of Emotional Distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-31

E. Special Prosecutor Nugent and Absolute Immunity . . . . . . . . . . . . . . . . . . . . . . 31-40

F. Second Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-52

1. Title VII of the Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . . . 41-42

2. Due Process Pursuant to the Fourteenth Amendment . . . . . . . . . . . . . . . . 42-43

3. First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-45

4. Equal Protection of the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-47

5. Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-52

G. Municipal Liability – Failure to Supervise, Failure to Train, and

Policy and Practicy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-62

1. Rensselaer County and Nugent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54-57

2. Town of North Greenbush . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-62

H. Sixth Cause of Action – Durivage's and Nugent's Negligence . . . . . . . . . . . . . 63-64

I. Sundry of Other Legal Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64-66

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-68

On June 5, 2007, *pro se* Plaintiff, John A. Aretakis, Esq., commenced a civil rights action, pursuant to 42 U.S.C. § 1983, against Police Officer Robert Durivage, Special Prosecutor Timothy Nugent, Esq., the Town of North Greenbush, and Robert D. Wells, alleging that his constitutional rights were violated when he was arrested on September 16, 2005, and prosecuted in the North Greenbush Town Court on two misdemeanors.  Dkt. Nos. 1, Compl. & 5, Am. Compl.  Challenging Aretakis's claims are three motions to dismiss and, in the alternative, two motions for summary judgment.  The pending dispositive motions are listed as follows: (1) Defendant Wells's Motion to Dismiss[2] pursuant to FED. R. CIV. P. 12(b)(6); (2) Defendants Durivage's and the Town of North Greenbush's Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6), as well as Motion for Summary Judgment, pursuant to FED. R. CIV. P. 56;[3] and (3) Defendant Nugent's Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(6) as well as a Motion for Summary Judgment, pursuant to FED. R. CIV. P.  56.[4]  Aretakis opposes each Motion.  Dkt. No. 62.[5]  In turn, only Defendants Wells and

---

[2] Wells's Motion to Dismiss is comprised of the following:

| | |
|---|---|
| Dkt. No. 50 | Motion to Dismiss |
| Dkt. No. 50-2 | Michael J. Costello, Esq., Decl., dated Mar. 6, 2008 |
| Dkt. No. 50-3 | Exs. |
| Dkt. No. 50-4 | Wells's Mem. of Law |

[3] Durivage's and the Town of North Greenbush's Motion is comprised of the following:

| | |
|---|---|
| Dkt. No. 52 | Motion to Dismiss and/or Summary Judgment |
| Dkt. No. 52-2 | Thomas K. Murphy, Esq., Decl., dated Mar. 14, 2008, as well as Exs A-D |
| Dkt. No. 52-3 | Robert J. Durivage Aff., dated Mar. 14, 2008 |
| Dkt. No. 52-4 | Material Statement of Facts |
| Dkt. No. 52-9 | Durivage's and Town's (hereinafter collectively referred to Durivage) Mem. of Law |

[4] Nugent's Motion is comprised of the following:

| | |
|---|---|
| Dkt. No. 53 | Motion to Dismiss and/or Summary Judgment |
| Dkt. No. 53-2 | Timothy J. O'Connor, Esq., Decl., dated Mar. 14, 2008, as well as Exs. |
| Dkt. No. 53-7 | Timothy Nugent, Esq., Aff., dated Mar. 13, 2008, as well as Exs. A-D |
| Dkt. No. 53-12 | Material Statement of Facts |

(continued...)

Nugent filed Replies to Aretakis's Opposition.  Dkt. Nos. 66 and 68.[6]

## I.  BACKGROUND

The Court has reviewed very carefully the lengthy Amended Complaint and the disputed Material Statements of Facts.  Although the parties' respective narrations may diverge, particularly as to the interpretation of actual events as well as the numerous contentions and inferences thereof, there is still a core set of facts upon which we may be able to analyze the stated claims for relief.  Regrettably, this core set of facts defies a brief recitation because of the divergent interpretations.

### A.  September 6, 2005 Incident

In order to appreciate the chain of events that commenced on September 6, 2005, and the underlying nature of this litigation, we must first gain an appreciation of the persona of Attorney Aretakis.  Over the years, Aretakis represented scores of people who have claimed to be victims of clergy sexual abuse.  These types of claims, as well as Aretakis himself, have captured widespread media exposure over the last several years, especially within the Northern District of New York.  Aretakis has served as an advocate on behalf of this high profile group and has been involved extensively in litigation against the Roman Catholic Diocese of Albany.

On September 6, 2005, Robert A. Wells, a process server, was assigned to serve a Summons

---

[4](...continued)
Dkt. No. 53-13    Nugent's Mem. of Law

[5] On May 30, 2008, in an omnibus filing, Aretakis filed his Opposition to each dispositive Motion.  That Opposition is comprised of the following:

Dkt. No. 62        Counter Statement of Material Facts, which was revised on June 5, 2008, Dkt. No. 64
Dkt. No. 62-3      John A. Aretakis Aff., dated May 30, 2008, with Exs
Dkt. No. 62-5      Nia C. Cholakis, Esq., Aff., dated May 29, 2008
Dkt. No. 62-6      Aretakis' Mem. of Law

[6] In terms of Replies to Aretakis's Opposition, Defendant Wells submitted a Reply Memorandum of Law, Dkt. No. 66, while, Defendant Nugent filed a Reply Memorandum of Law, Dkt. No. 68, and another Affidavit from Timothy Nugent, which is dated June 12, 2008, Dkt. No. 68-4.

and Complaint from the Albany Catholic Diocese upon Aretakis.  Am. Compl. at ¶ 17.  It was

anticipated that Aretakis would be served in the Town of North Greenbush.  *See infra* Part I.D

(discussion on court jurisdiction).  For the purposes of these motions, we will accept as true that

Aretakis was returning from New York City to attend to his family, particularly his wife who had

called to advise him that she was being taken to the hospital, possibly because of a cardiac event.

Am Compl. at ¶ 25.  After securing his son but prior to rendezvousing with his parents, who were

awaiting him at another location in order to transfer custody of his son to them while he traveled to

the hospital to visit with his wife, Wells and Aretakis had an altercation.  Aretakis claims that Wells

pursued him from his house until they both stopped their vehicle in a school parking lot.  *See*

*generally* Dkt. No. 53-4 & 53-5, (Exs. B-1 & B-2); John A. Aretakis, Dep., dated Feb. 7, 2007, at

pp. 28-64.  Here the version of events differ dramatically.

### 1.  Robert Wells's "Abbreviated" Version of the Events

Both Robert and Rosemary Wells aver in separate Affidavits, which were attached to

criminal complaints filed against Aretakis, that Robert, who had served papers upon Aretakis in the

past, was attempting to serve him once again.  When he recognized Aretakis's car, Wells followed

him until they both stopped in a traffic circle on school grounds.  Wells swears that as he was exiting

his vehicle Aretakis was driving towards him and he believed that Aretakis was going to ram him

so he jumped back into his car.  When Aretakis's car came to rest, Wells eventually got out of his

car and approached Aretakis's car and placed legal papers on the hood of that car.  He then told

Aretakis that he had been legally served.  As he was returning to his car, Aretakis got out of his car

and approached Wells's vehicle.  Wells then avers that

> John Aretakis then came to my car and grabbed the drivers side window and door.
> He then tried to shake the window and door and attempted to open the door.  He was

> trying to reach in my vehicle.  He was calling me an asshole and saying that he would kick my ass.  I yelled for my wife to call 911 for help.  Then I told him [to] go ahead hit me and then I will have you arrested.  At this point he was waist deep inside my car trying to get my car keys out of the ignition.  He was screaming and yelling.  I then said, I will get out of the car and I will let you hit me.  I didn't even get out of the car.  I noticed that he opened the back driver's side of my car door.  He then went inside my back seat and started to grab items from my back seat.  I said to him what the hell are you doing?  He took my black leather pouch briefcase with handles.  It contained summons, affidavits and legal documents.  He took my checkbook from citizens [sic] Bank.

Dkt. No. 53, Ex. A.,  Robert Wells Dep., dated Sept. 6, 2005.[7]

Eventually, Wells and his wife were interviewed by Officer Durivage in Officer Jus's presence.  Those interviews were reduced to sworn statements, which were made a part of Criminal Informations that were filed against Aretakis for Harassment in the Second Degree in violation of New York Penal Law § 240.26(1) and Petty Larceny in violation of New York Penal Law § 155.25, and further served as a basis for a warrant of arrest.  *See* Dkt. No. 53, Ex. B., Criminal Informations and Warrant of Arrest.

### 2.  John Aretakis's "Abbreviated" Version of the Events

As stated above, Aretakis was making arrangements to visit his wife, who was hospitalized, as well as making child care arrangement with his parents.  While traveling to meet his parents, there came a point in time when he realized that he was being followed by another vehicle.  He pulled into the Gardner Dickinson Grade School parking lot followed by Wells.  At some point Wells approached Aretakis's car with something in his hands and he eventually placed a big white package on Aretakis's windshield, saying something to the effect that he had been served and then swore at him.  Aretakis then demanded some identification.  Believing Wells had business cards on his car

---

[7] As stated above, Rosemary Wells, who was a passenger in the vehicle, gave a similar rendition of the events. *See* Dkt. No. 53, Ex. A, Rosemary Wells Dep., dated Sept. 6, 2005.  Officer Jus served as a witness to both Robert and Roberta Wells's sworn statements.

dash, Aretakis reached into the front window of Wells's car. Upon Aretakis reaching into his vehicle, Wells placed his hand on Aretakis's hand as if to deflect his efforts and during the course of that struggle someone shut off the ignition of the car. Then Aretakis leaned into the back seat of the driver side window of Wells's car and gained a hold of a "file folder" or a briefcase, as he continued to look for Wells's identification. Wells was screaming to his wife to call 911. Somehow the car window was rolled up and Aretakis was pinned in the window. Aretakis eventually extricated himself from the window before Wells drove off, but when he did Aretakis had the "billfold" in his hands. Aretakis dropped the "billfold" or briefcase on the grass alongside the pavement of the parking lot. Eventually, Aretakis left the scene and met up with his parents. While speaking with his parents, he recalled Mrs. Wells attempting to call 911 and then told them that there were some materials left on the ground near the school and asked his mother to retrieve it, which she did. Later, Aretakis went to his parents' home and retrieved the "billfold." Dkt. No. 53-4, Exs. B-1 & B-2, John A. Aretakis, Dep., dated Feb. 7, 2007, at pp. 28-64; Dkt. No. 62-3, Aretakis Aff., at ¶¶ 6-11.

### B. Town of North Greenbush Police Department Investigation

Mrs. Wells made a 911 call to police during the incident and North Greenbush Police Officer Jus arrived on the scene. Later that day, Defendant Durivage assumed responsibility for the investigation of this matter. Aretakis Aff. at ¶ 12; Dkt. No. 52-3, Robert J. Durivage Aff., dated Mar. 14, 2008, at ¶ 2; *see also* Am. Compl. at ¶¶ 41, 59-61, & 81. That same evening, Wells expressed a desire to file charges against Aretakis and Officers Durivage and Jus took sworn statements from Mr. and Mrs. Wells. Durivage Aff. at ¶ 3. Durivage may have typed the statements and Jus acted as a witness to the Mr. and Mrs. Wells's execution of their respective signed

statements.  *See* Dkt. No. 52, Exs. C-4. Mr. & Mrs. Wells's Sworn Statements.  In sum, Mr. and

Mrs. Wells's sworn statements accused Aretakis of harassment and petty larceny. *Id*.; Durivage Aff.

at ¶¶ 4-6; *see also* Am. Compl. at ¶ 26.

That same evening, Durivage contacted Aretakis by telephone and discussed the incident

with him.  Durivage Aff. at ¶¶ 6 & 7.  In fact, over the next couple of days, Durivage and Aretakis

spoke several times about the incident.    Aretakis Dep. at p. 67.  During their conversation on

September 7, 2005, Durivage advised Aretakis to bring Wells's property to the police department.

Durivage Aff. at ¶ 7.  On September 7th, at approximately 7:43 p.m., Aretakis brought Wells's

briefcase to the police station and left it with the Dispatcher, Officer Littlefield.  *Id*. at ¶ 8; Dkt. No.

52, Ex. C-6, Adam J. Littlefield Dep., dated Sept. 7, 2005.  Upon recovering the briefcase, Durivage

called Wells, who reiterated that he wanted to pursue charges against Aretakis.  Durivage Aff. at ¶

9.

Criminal Informations were prepared accusing Aretakis of violating New York State Penal

Law § 240.26(1), Harassment in the Second Degree, and § 155.25, Petty Larceny, and, on September

9th, Wells reviewed and signed the Informations under the penalty of perjury.  Durivage Aff. at ¶

10; Dkt. No. 52, Exs. C-2 & C-3, The Informations.  On September 14, 2005, the Informations and

supporting depositions were submitted to the Town of North Greenbush Justice for a warrant of

arrest.  On September 15, 2008, the Honorable Andrew G. Ceresia, the Town Justice, issued the

warrant for Aretakis's arrest.  Durivage Aff. at ¶¶ 11 & 12; Dkt. No. 52, Ex. C-1, Warrant of Arrest.

On that same day, Durivage contacted Aretakis and advised him of the warrant and provided him

with an opportunity to turn himself in voluntarily.  On September 16, 2005, Aretakis appeared, was

processed, and arraigned on the charges.[8]  *See* Am. Compl. at ¶ 107.  He was eventually released on his own recognizance.  Durivage Aff. at ¶¶ 13 &14.

### C.  Appointment of the Special Prosecutor and the Criminal Trial

The Rensselaer County District Attorney disqualified her office from prosecuting this matter because Aretakis was a victim in another matter being handled by her office.  Upon determining that the disqualification was appropriate, the Honorable Thomas B. Canfield, New York Supreme Court Justice, pursuant to New York County Law § 701(1)(d), appointed Defendant Nugent to act as a Special District Attorney regarding the criminal prosecution of Aretakis.  Dkt. No. 53, Ex. C, Order, dated Oct. 13, 2005; Dkt. No. 53-7, Timothy Nugent, Esq., Aff., dated Mar. 13, 2008, at ¶ 6.[9] Immediately thereafter, Aretakis filed a motion with the Honorable Andrew Ceresia, Town of North Greenbush Justice, seeking his recusal from presiding over this criminal prosecution.  Justice Ceresia granted the motion and recused himself.  Dkt. No. 62-5, Nia Cholakis Aff., dated May 30, 2008, at ¶ 28.[10]  In his stead, the Honorable Paul G. Toomey, Town Justice for the Town of Sand Lake, was appointed to preside over this criminal prosecution.

Omnibus Motions were filed, which included a Motion to Dismiss.  The Motion to Dismiss was denied.  Nugent Aff. at ¶ 7; Dkt. No. 53, Ex. D, Order, dated May 27, 2008.  This matter went

---

[8] Aretakis states that after he turned himself into the police department, he was handcuffed, fingerprinted, photographed, and transported in a squad car presumably to the Town Court of North Greenbush.  Aretakis Aff. at ¶ 28; Dkt. No. 5, Am. Compl. at ¶ 100.

[9] Aretakis notes in his Amended Complaint that prior to Nugent's appointment, Carmelo LaQuidera, Esq., was appointed as the special prosecutor, however, LaQuidera withdrew.  Am. Compl. at ¶ 15.

[10] No official reason is stated within this record as to why Judge Ceresia recused himself from this case. Aretakis's wife, Nia Cholakis, however, postulates that there existed a conflict of interest which started in 1999.  In 1999, she was elected Town of North Greenbush Justice in 1999 defeating Ceresia and, according to her and Aretakis there has been hard feeling between the respective families ever since.  Cholakis avers that in previous cases involving Aretakis, Judge Ceresia would recuse himself.  Cholakis Aff. at ¶¶ 25-28.

to trial and Aretakis represented himself.  After five days of trial, on June 9, 2006, Aretakis was

acquitted of both charges.  *Id.* at ¶ 8; *see* Am. Compl. at ¶ 174.

### D.  Commencement of this Litigation.

On September 5, 2006, Aretakis filed a Notice of Claim, pursuant to New York Municipal

Law § 50-e, accusing Defendants of malicious prosecution, false arrest, and violations of his

constitutional rights, among other violations and offenses.  Dkt. No. 52, Ex. D, Notice of Claim.

Pursuant to Municipal Law § 50-h, Aretakis submitted to a deposition on February 7, 2007.

Thereafter, on June 8, 2007, Aretakis commenced this action in the United States District Court for

the Southern District of New York, presumably asserting that his official residence was within that

District.  Dkt. No. 1, Compl.  On October 9, 2007, Aretakis filed an Amended Complaint, Dkt. No.

5, to which each Defendant filed an Answer, Dkt. Nos. 7, 37, & 40.

A Motion to Dismiss, pursuant to FED. R. CIV. P. 12(b)(3), for improper venue as well as

a Cross Motion to disqualify Wells's Attorney were filed with the Honorable Shira A. Scheindlin,

United States District Judge for the Southern District of New York .  *See generally* Dkt. Nos. 18-20,

22, 23, & 26.  By an Order, dated November 30, 2007, Judge Scheindlin transferred this case to the

Northern District of New York, along with all other pending motions.  Dkt. No. 33.

Aretakis brings this action, pursuant to 42 U.S.C. § 1983, alleging that his civil rights under

the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution were violated,

as well state tort claims of false arrest, malicious prosecution, negligence, and intentional infliction

of emotional distress.  What is problematic with the Amended Complaint, among other things, is that

it is not a model of conciseness, precision, nor clarity as required by FED. R. CIV. P. 6.  For example,

when identifying a particular cause of action, elements of other causes of action are randomly stated

therein, making it difficult to discern what cause of action is actually being identified.  Such

pleading methodology is aptly described as a "shotgun" pleading wherein the facts and elements are

scattered about the complaint.  Nonetheless, we suspect that the causes of action pled in Aretakis's

Amended Complaint against these Defendants, jointly and severally, may be stated as follows:

| *Cause of Action* | *Paragraphs* | *Nature* |
|---|---|---|
| First | ¶¶ 89-112 | Intentional Infliction of Emotional Distress |
| Second | ¶¶ 113-135 | Violation of Plaintiff's First Amendment right of free speech and other constitutional rights as well as Title VII of the Civil Rights Act of 1964 for discrimination based upon his religion, his work, and his outspoken criticism of the Catholic Church.  *See* ¶ 114. |
| Third | ¶¶ 136-150 | Violation of Plaintiff's Fourth and Fourteenth Amendment rights for failure to properly train police officers. |
| Fourth | ¶¶ 151-162 | Failure to properly supervise police officers. |
| Fifth | ¶¶ 163-174 | False arrest, malicious prosecution, and violation of Plaintiff's civil rights. |
| Sixth | ¶¶ 175-182 | Negligence |
| Seventh | ¶¶ 183-188 | Violation of Plaintiff's First Amendment rights by hindering and chilling the Plaintiff's free speech rights. |

In addition to denying the allegations, Wells has pleaded the affirmative defense of statute

of limitations, failure to state a cause of action, and two counterclaims which state different theories

of emotional distress.  Dkt. No. 37, Wells Am. Ans.  Durivage, as well as denying the allegations,

pled the affirmative defenses of statute of limitations, the existence of probable cause, failure to state

a cause of action, qualified immunity, and failure to comply with New York State General Municipal

Law.  Dkt. No. 40, Durivage Am. Ans.  Likewise, Defendant Nugent denied the allegations and pled

the affirmative defenses of failure to state a cause of action, absolute and qualified immunity, and

the statute of limitations.  Dkt. No. 7, Nugent Ans.

*-11-*

## II.  ANALYSIS

All of the Defendants have filed Motions to Dismiss the Amended Complaint, and, in the alternative, Defendants Durivage and Nugent have further filed Motions for Summary Judgment.

### A.  Motion to Dismiss Standard

On a motion to dismiss, the allegations of the complaint must be accepted as true.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972).  "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice."  *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis added)).  On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6 (1963); *see also Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008).  Thus, the plaintiff need not necessarily plead a particular fact if that fact is a

reasonable inference from facts properly alleged.  *See id.; see also Wheeldin v. Wheeler*, 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint).  A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).[11] The Court of Appeals for the Second Circuit has recently interpreted the foregoing language as requiring that lower courts apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*[,]" but does not require a heightened pleading standard for civil rights claims.  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).  In spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

**B.  Summary Judgment Standard**

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . .  the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex*

---

[11] By its opinion in *Bell Atlantic*, the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968 (2007) (quoting *Conley*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).  In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  *Id.* at 1969.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this

*-14-*

point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).   Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

Aretakis's Amended Complaint is truly unconventional.  One of the more troublesome aspects of the Amended Complaint and Aretakis's Opposition to these dispositive motions, which has truly made our analysis unnecessarily cumbersome, is Aretakis's barrage of conclusions and suppositions and the fact that interjection of truly irrelevant points and issues far exceed the presence of facts.  Our ability to discern and observe relevant and material facts was severely plagued by the kaleidoscope of conclusory statements and the inordinate assignment of the other parties' and nonparties' ulterior motives in causing his arrest and prosecution.[12]

## C.  False Arrest, Malicious Prosecution, and Constitutional Violations

In his fifth cause of action, Aretakis claims that all of the Defendants participated in his false arrest, maliciously prosecuted him, and further violated his "civil rights."  Am. Compl. at ¶¶ 164-74.  As a generally recognized constitutional principle, false arrest and malicious prosecution causes of action, in the context of a § 1983 action, are subsumed by the Fourth Amendment and are applicable

---

[12] The Amended Complaint and Aretakis' Opposition to the various dispositive motions are thoroughly riddled with diatribes against the Roman Catholic Church and its officials and agents, who are, by the way, not parties to this action.  Considerable effort is expended by Aretakis to castigate the Roman Catholic Diocese as the catalyst for these cataclysmic events, his arrest and prosecution for petty larceny and harassment, without naming them as a party.  Hardly a page can be turned in the Amended Complaint and his Opposition where the reader is not regaled by Aretakis about his long-term crusade and struggle against the Catholic Church on the issues of clergy sexual abuse and how the Catholic Church has so poisoned the well against him that these named Defendants and even the government have joined the Catholic Church's cabal to injure him.

Additionally, Aretakis's Amended Complaint and Opposition excessively and repetitively ascribes a catch basin of assorted venal motives to all Defendants and thus, intended or not, muddles the actual conduct we are required to review.  Maybe all of this could be ignored or excused but for the frightening pattern of Aretakis's pleadings.  *See e.g., Zlotnick v. Hubbard et al.*, 1:07-CV- 405; *People v. Allen*, 34 A.D.3d 1044 (N.Y. App. Div. 3d Dep't 2006); *In re Aretakis*, 2008 WL 5170771 (N.Y. App. Div. 3d Dep't Dec. 11, 2008); *Hoatson v. New York Archdiocese*, 280 Fed. Appx. 88 (2d Cir. 2008).

to the states through the Fourteenth Amendment.  In vindicating those constitutional protections from unreasonable seizures, we acknowledge that they are "substantially the same claim as claims for false arrest and malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Albright v. Oliver*, 510 U.S. 266 (1994).

Contrary to proper pleading standards, Aretakis merges these independent causes of action of false arrest and malicious prosecution into one captioned cause of action.  Notwithstanding this infirmity, we will address both common law causes of actions as well as the alleged Fourth Amendment constitutional violations.  With this notion clearly established for review, we begin our determination of whether the alleged false arrest, malicious prosecution, and violation of the Fourth Amendment survive these Motions.

## 1.  False Arrest

False arrest is a species of false imprisonment. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).[13]  Under New York law, to prevail on a false arrest claim, a plaintiff must show (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. Ct. App. 1975).  The quintessential justification, or defense if you will, to false arrest is the presence of probable cause. *Weyant v. Okst*, 101 F.3d at 852 (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (noting that the existence of

---

[13] The terms false arrest and false imprisonment are always stated in tandem, yet they are not distinct causes of action but rather, false arrest is only a species of false imprisonment. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).  Because they are corollaries of each other, the nomenclature can be, and often are, employed interchangeably.  Nonetheless this species of action is rather distinct from another common law cause of action, malicious prosecution, which is often concurrently invoked in these types of lawsuits. *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (N.Y. Ct. App. 1975).

*-16-*

probable cause "is a complete defense to an action for false arrest")).  Essentially, the presence of

probable cause proclaims that the arrest and confinement were privileged.  In order for probable

cause to exist for an arrest, the arresting officers must

> have knowledge or reasonably trustworthy information of facts and circumstances
> that are sufficient to warrant a person of reasonable caution in the belief that the
> person to be arrested has committed or is committing a crime. [citations omitted] .
> . . [Therefore] [a] district court must look to the 'totality of the circumstances.'
> [citation omitted].  In looking to the totality of the circumstances, courts must be
> aware that 'probable cause is a fluid concept – turning on the assessment of
> probabilities in particular factual contexts– not ready, or even usefully, reduced to
> a neat set of legal rules.'

*Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (citations omitted).

In essence, probable cause is determined by the facts available to the officers at the time of the arrest

and immediately before.  *Id*; *Jocks v. Tavernier*, 316 F.3d at 135.  Further stated, "the probable cause

inquiry is based upon whether the facts known by the arresting officer at the time of the arrest

**objectively** provided probable cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)

(quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (emphasis added)); *Maliha v. Faluotico*,

286 Fed. Appx. 742, 744 (2d Cir. 2008) (noting that probable cause is an objective test).[14]

## 2.  Probable Cause

Aretakis, supported by Cholakis, rails against the arrest and prosecution.  Their essential

incrimination is that there was no probable cause for either his arrest or the criminal prosecution,

notwithstanding the issuance of a warrant of arrest by a neutral magistrate.  Exclaiming that his

arrest lacked probable cause, Aretakis launches a torrent of accusations against Durivage.  It should

---

[14] The emphasis is added to clarify commentary provided by Nia Cholakis, Esq., Aretakis's wife, who, because of her erstwhile employment as a Town Justice and criminal law practitioner for over fifteen years, claims some expertise in these types of matters.  In spite of that experience, she baldy and erroneously asserts that the "concept of probable cause is esoteric and often times a subjective interpretation."  Dkt. No. 62-5, Nia Cholakis, Esq., Aff., dated May 30, 2008, at ¶ 28.

not elude us that the burden of establishing lack of probable cause rests with Aretakis.

Aretakis complains that Durivage, among other things, has held a long-term, deep-seeded, acrimonious hatred of him and his family.  He further alleges that the intensity of Durivage's vitriol and questionable omissions and commissions toward Aretakis was exacerbated by Durivage's keen awareness of Aretakis's high profile role as an advocate against clergy abuse and Durivage's active participation in town politics.  Aretakis Aff. at ¶¶ 14-23; Am. Compl. at ¶¶ 48-49 & 51-53.  He maintains that because of this simmering animosity and bias Durivage permitted false and fabricated allegations by Wells to be lodged against Aretakis.

Based upon Durivage's investigation instituted prior to the warrant of arrest being issued, Aretakis contends that Durivage knew the facts and circumstances of the September 6, 2005 Incident.  Durivage spoke with the witnesses, including Aretakis, who claims to have been secretly recorded.  Am. Compl. at ¶ 59.  Aretakis proffers that Durivage knew about Wells's several felony convictions while also knowing that he had never been arrested; Durivage knew about the Catholic Church's attempts to have him arrested on other occasions; Durivage ignored evidence that during the incident Aretakis was on the telephone; Durivage repeatedly lied to the jury; that there was overwhelming evidence of his innocence; and Durivage conducted the investigation with hostility, bias, and animus toward him.  *See generally* Aretakis Aff. & Cholakis Aff. at ¶¶ 9-14.

Aretakis further contends that probable cause did not exist for a warrant for his arrest because the Judge who issued the warrant was biased and impartial because of political conflicts, which eventually lead to his recusal.  Though not factually supported by the record, Aretakis contends that by recusing himself, Judge Ceresia was conceding that he had a bias and a conflict from the beginning stages of this prosecution and that the executed warrant by "an admittedly biased

*-18-*

judge is indicative that the warrant was biased and unfair, as Mr. Ceresia was only glad to oblige Captain Durivage in a prosecution of a lawyer with no prior criminal record.  The Judge who signed the warrant should not have because probable cause did not exist and because his bias prohibited him from objectively evaluating whether probable cause existed."   Cholakis Aff. at ¶¶ 28-29. Because of the recusal, Aretakis posits that the warrant was tainted and negated probable cause. Aretakis at ¶ 59.

However, we have a facially valid warrant issued by a Town Justice on September 15, 2005. Dkt. No. 53, Ex. C, Warrant.  The warrant was issued after Town Justice Andrew Ceresia reviewed the drafted Informations and written depositions of Mr. and Mrs. Wells.  *Id*. at Ex. B; Durivage Aff. at ¶ 11.   As a general proposition of law, when a judge grants a warrant of arrest, there is a presumption that the arrest was issued on probable cause.  *Broughton v. State*, 37 N.Y.2d at 458. Causes of action for false arrest and the Fourth Amendment cannot lie where the arrest was made pursuant to a valid warrant issued by an impartial judge with jurisdiction since the arrest and subsequent confinement are privileged.  *Ellsworth v. City of Gloversville*, 269 A.D.2d 654, 656 & 657 (N.Y. App. Div. 3d Dep't 2000).   However, a plaintiff who challenge the validity of an arrest warrant faces a heavy burden.  *Simms v. Vill. of Albion*, New York, 115 F.3d 1098, 1107 (2d Cir. 1997) (citation omitted).  He must rebut the presumption of probable cause.  Nonetheless, there cannot be a constitutional violation where the arresting officer had probable cause.  *Singer v. Fulton County Sheriff*, 63 F.3d at 119.

Aretakis insists that Durivage had a duty to investigate further and not rely upon the statements of Mr. and Mrs. Wells.  His exculpatory statements to Durivage, another eye witness account that challenges Mr. and Mrs. Wells's version of events, knowledge of the disparate

backgrounds of Aretakis and Wells, and Durivage should have known that Wells was lying and fabricating facts, all should have supported his innocence rather than probable cause for his arrest.

In some circumstances, a police officer's awareness of facts supporting a defense may mollify or eliminate probable cause. *Jocks v. Tavernier*, 316 F.3d at 135. Investigating and arresting officers may not ignore exculpatory evidence nor deliberately disregard facts which can establish justification for someone's questionable actions but, for the most part, they do not have to investigate exculpatory offerings by the party being arrested, assess the credibility of unverified claims of justification, or verify the existence of defenses. *Id.* at 135-36 (citing *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123 (2d Cir. 1997)). Once the arresting officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretical plausible claim of innocence before making an arrest nor does he have to believe with any reasonable degree of certainty the arrestee will be successfully prosecuted. *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); *see also Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through weighing the evidence.") (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989)); *Donovan v. Briggs*, 250 F. Supp. 2d 242, 258-59 (W.D.N.Y. 2003) (arresting officer, though having to make credibility judgments, need not function as a jury and determine guilt or innocence or require a suspect's guilt beyond a reasonable doubt). In most instances, "[a]n arresting officer advised of a crime by a person who claims to be the victim, [or an eye witness] and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's

veracity." *Singer v. Fulton County Sheriff*, 63 F.3d at 119.   But even doubts about a victim's veracity will not completely derail the presence of probable cause.  *Jocks v. Tavernier*, 316 F.3d at 138 (false information will not dissipate probable cause); *Curley v. Vill. of Suffern*, 268 F.3d at 70 (does not matter if the investigation casts doubt on the basis of arrest).[15]

This case is an example of the quagmire police officers generally find themselves when they are presented with different versions of the events.  But probable cause has been found where a police officer was confronted with different stories from an alleged victim and the arrestee.  *Curley v. Vill. of Suffern*, 268 F.3d at 70.  "Although a better procedure may have been for the officers to investigate plaintiff's versions of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him . . . [n]or does it matter that an investigation might have cast doubt upon the basis for the arrest."  *Id*. at 70 (citing *Krause v. Bennett*, 887 F.2d 362, 371-72 (2d Cir. 1989).  The Second Circuit has consistently made clear that "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause . . . and an officer's failure to investigate an arrestee's protestation of innocence generally does not vitiate probable cause."  *Panetta v. Crowley*, 460 F.3d at 396 (quoting *United States v. Fama*, 758 F.2d 845, 838 (2d Cir. 1985) & citing *Curley v. Vill. of Suffern*, 268 F.3d at 70).  Lastly, Aretakis levels a battery of impeachment of Durivage's motivation in this investigation and questions his every move.  Even if there is a question of Durivage's motivation, motivation is not a consideration in a court's objective assessment of probable cause.  *Singer v. Fulton County Sheriff*, 63 F.3d at 119; *Maliha v. Faluotico*, 286 Fed. Appx. at 744 (officer's motivation is not relevant).

---

[15] Here, Aretakis tries to undermine Wells's credibility by claiming that he is a minion of the Catholic Church who seeks to harm Aretakis and that Wells is a convicted felon.  These suppositions alone do not cast doubt on Mr. and Mrs. Wells's version of the events.  *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

We now turn to whether probable cause existed on September 16, 2005, and we must look at the totality of the circumstances and consider those facts available to Durivage immediately before and at the time of the arrest. *Lowth v. Town of Cheetowaga*, 82 F.3d 563, 569 (2d Cir. 1996). As such, we must determine whether a reasonable juror could believe that Durivage lacked probable cause to arrest Aretakis for Petty Larceny and Harassment in the Second Degree.  Here, Durivage had sworn statements from the alleged victim and another eye witness that Aretakis harassed him and stole his briefcase.  Durivage had spoken with Aretakis who relatively admitted being involved in an affray with Wells and may have had possession of Wells's briefcase, although he did not admit that he committed any crime, especially stealing Wells's property.  However, Aretakis's possession of that briefcase was later confirmed when Aretakis delivered it to the Town of North Greenbush police station.  Even after the retrieval of the briefcase, Wells continued to request prosecution of Aretakis and signed the Informations charging Aretakis with the crimes of harassment and petty larceny.

Aretakis argues that there was no probable cause for either offense.  An examination of the elements of these offenses as set forth in the Informations and the written depositions by Mr. and Mrs. Wells belie Aretakis's position.  Regarding the charge of Harassment in the Second degree, Aretakis and Cholakis claim that the necessary element of physical contact or even more was neither present nor pled in the Information thus depriving the matter of probable cause.  Cholakis avers that "**aggravated** harassment in the 2nd degree required physical contact as a required element of the offense, or if only a threat of violence, the accused must have a weapon that could carry out the threat." Cholakis Aff. at ¶ 17 (emphasis added); *see* Am. Compl. at ¶ 46.  But, it appears that both Aretakis and Cholakis misapprehend the very nature of the Harassment in the Second Degree

charge.

First, Aretakis was not charged with Aggravated Harassment in the Second Degree.  The actual charges listed in both the warrant of arrest and Informations are Harassment in the Second Degree,  in violation of New York Penal Law § 240.26(1), and Petty Larceny, in violation of New York Penal  Law § 155.25.  A person commits harassment in the second degree when, with the intent to harass, annoy, or alarm another person, he strikes, shoves, kicks or otherwise subjects such other person to physical contact, or **attempts or threatens to do the same**.  N.Y. PEN. L § 240.26(1) (emphasis added); *People v. Bartkow*, 96 N.Y.2d 770, 772 (N.Y. Ct. App. 2001).  What Aretakis has conveniently failed to consider is that a genuine threat of physical harm falls within the scope of the statute.  *People v. Dietze*, 75 N.Y.2d 47, 54 (N.Y. Ct. App. 1989); *In re Shane EE,* 48 A.D.3d 946, 947-48 (N.Y. App. Div. 3d Dep't 2008) (even for aggravated harassment, a threat can suffice); *Nacarato v. Scarselli*, 124 F. Supp. 2d 36, 41 (N.D.N.Y. 2000) (reciting the statute for the proposition that genuine threats of physical harm fall within the scope of the statute); *Warlock Enter. v. City Center Assoc*., 204 A.D.2d 438 (N.Y. App. Div. 2d Dep't 1994) (assuming that the threat to kill was genuine, it constituted harassment in the second degree); *People v. Henry*, 159 A.D.2d 990 (N.Y. App. Div. 4th Dep't) *app. denied* 76 N.Y.2d 736 (N.Y. Ct. App. 1990) (harassment covers either physical contact or the threat of physical contact).

The Harassment in the Second Degree Information states in part:

Said Defendant [on the 6th day of September, 2005], with the intent to harass, annoy or alarm another person, did threaten another person namely Robert D. Wells by reaching inside the victims vehicle window stating to the victim " You're an asshole, I am going to kick your ass" causing the victim to feel threatened and alarmed . . . and shook [the driver's side window] in a violent manner".

Dkt. No. 52, Ex. C-2.

Mr. and Mrs. Wells' sworn statements reiterate those exact allegations.  *Id*., Ex. C-4.  In essence,

Wells avers that Aretakis, among other things, reached into his vehicle, attempted to grab his car keys, was screaming, yelling, and calling him names, and threatened to "kick his ass." It is clear that Wells's complaint meets the elements of this crime, even though Aretakis may have given an explanation or disclaimer for his conduct. Based upon both the sworn Information and the written depositions, both Durivage and the Town Justice had probable cause to issue a warrant based upon Harassment in the Second Degree. *See Jaegly v. Couch*, 439 F.3d 149 (a case concerning harassment in the second degree where probable cause was found).

Regarding the Petty Larceny charge, Aretakis posits that Durivage knew that there was no intent to steal the property. Am. Compl. at ¶ 47. It is his view that possessing the briefcase for no more than twenty-four hours does not constitute petty larceny. Petty larceny is committed when a person steals property. N.Y. Pen. L § 155.25. The crime of larceny consists of an unauthorized taking, however temporary, where the accused exercised dominion and control over the property for a period of time, in a manner wholly inconsistent with the owner's continued rights. *People v. Jennings*, 69 N.Y.2d 103, 118 (N.Y. Ct. App. 1986); *People v. Olivo*, 52 N.Y.2d 309, 318 (N.Y. Ct. App. 1981) (all that is needed for this crime is to exercise dominion and control wholly inconsistent with the owner's rights). The length of the taking is not relevant, just the virtual permanent control over the property. *People v. Jensen*, 86 N.Y.2d 248, 252 (N.Y. Ct. App. 1995) (the accused only had the property for ten minutes and still met a prima facie case of larceny).

In our case, the Criminal Information, sworn to by Wells, states that Aretakis removed Wells' briefcase from the car, which contained legal documents, a calculator, cell phone charger, checks from clients, and other items. Dkt. No. 52, Ex. C-3. Wells's written deposition stated practically the same thing, and Mrs. Wells's rendering of the events corroborates her husband. *Id.*

at Ex. C-4.  Moreover, Officer Littlefield's sworn statement states that Aretakis brought the briefcase to the police station on September 7, 2005.  In arguing that there was a lack of probable cause, Aretakis conflates the standard for probable cause with the burden of proof beyond a reasonable doubt.  He argues that he did not take it but that it dropped to the ground; his mother retrieved it for him; he returned it to the police department as requested; and, thus, did not have an intent to steal. Even if Durivage knew Aretakis's side of the story, again, both the Information and the depositions establish a prima facie charge of petty larceny and, in the totality of the circumstances, provided probable cause for the warrant of arrest.

We repeat that whether Aretakis was innocent is not critical in determining if Durivage had probable cause to arrest him.  Even the discrepancies amongst the participants will not vitiate probable cause.  Whether Wells's credibility was undermined by his criminal record, the alleged presence of ill motives on the part of Durivage, and some inconsistencies as to all of the witnesses' accounts, we must determine probable cause on what the investigator knew at the time of the arrest. *See Escalera v. Lunn*, 361 F.3d 737, 746 (2d Cir. 2004) (knowing the victim's criminal history is not enough to destroy probable cause); *Donovan v. Briggs*, 250 F. Supp. 2d 242 (a rape victim who subsequently admitted fabricating the charge did not undermine the existence of probable cause at the time of the arrest).  The salient element of probable cause to arrest is whether the officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution that the defendant has committed a crime. *Id*. at 250-51. Durivage was entitled to rely upon Mr. and Mrs. Wells's contemporaneous account of the altercation. *Maliha v. Faluotico*, 286 Fed. Appx. at 743.  We find, as a matter of law, the written depositions and Durivage's investigation were reasonably trustworthy and supported the presence

*-25-*

of probable cause.  The totality of the circumstances can only lead us to conclude that probable

cause existed.  *Snow v. Vill. of Chatham*, 84 F. Supp. 2d 322, 327 (N.D.N.Y. 2000) (probable cause

may be determined as a matter of law).  Therefore, because an essential element is lacking,

Aretakis's Fourth and Fourteenth Amendment claims, as well as the common law action of false

arrest, cannot now be established.

### 3.  Malicious Prosecution

False arrest and malicious prosecution are kindred actions.  *Broughton v. State*, 37 N.Y.2d

at 456.  As previously stated, malicious prosecution, like false arrest, when considered in the context

of a § 1983 action, has, for all purposes, Fourth Amendment constitutional relevance.  *Jocks v.*

*Tavernier*, 316 F.3d at 134 (citing *Weyant v. Okst*, 101 F.3d at 852 ); *Murphy v. Lynn*, 118 F.3d 938,

945 (2d Cir. 1997) ("'Deprivation of liberty [such as restriction on travel and mobility] that go hand

in hand with criminal prosecutions' have 'Fourth Amendment [] relevance.'" (citations omitted)).

Whether based upon federal or state law, the elements for malicious prosecution are the same.

*Gauthier v. Town of Bethlehem*, 1993 WL 489684, at *5 (N.D.N.Y. Nov. 24, 1993) (citations

omitted).  To state a cause of action for malicious prosecution under § 1983, a plaintiff would have

to establish

> (1) the initiation or continuation of a criminal proceeding against plaintiff; (2)
> termination of the proceeding in plaintiff's favor; (3) lack of probable cause for
> commencing the proceeding; and (4) actual malice as a motivation for defendant's
> actions. *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal quotation marks
> omitted).  Additionally, there must be a post-arraignment seizure for a § 1983
> malicious prosecution claim; however, the requirements of attending criminal
> proceedings and obeying the conditions of bail suffice on that score. *Id*. at 946.

*Jocks v. Tavernier*, 316 F.3d at 136; *see also Murphy v. Lynn*, 118 F.3d at 947 (quoting *Russell v.*
*Smith*, 68 F.3d 33, 36 (2d Cir. 1995) & citing *Broughton v. State*, 37 N.Y.2d at 457 ).

The essence of malicious prosecution is the perversion of proper legal procedures and, thus, some

*-26-*

sort of prior judicial proceeding is the *sine qua non* of a cause of action sounding in malicious prosecution. *Broughton v. State*, 37 N.Y.2d at 457.

Aretakis was acquitted of both charges and it is unchallenged that he has established a favorable disposition of his criminal prosecution. Even if it were challenged, it would be a matter of law for this Court, which we would find accordingly, that such an element has been proven. *See Murphy v. Lynn*, 118 F.3d at 948-52 (thorough discussion on what constitutes a favorable termination); *Weyant v. Okst*, 101 F.3d at 853-54 (acquittal is a favorable termination); *Conway v. Vill. of Mt. Kisco*, 750 F.2d 205, 214-15 (2d Cir. 1984).

Malice is an indispensable element of malicious prosecution. *Hickland v. Endee*, 574 F. Supp. 770, 778 (N.D.N.Y. 1983) (citing *Russo v. State of New York*, 672 F.2d 1014, 1018 (2d Cir. 1982) & *Martin v. City of Albany*, 42 N.Y.2d 13, 16 (N.Y. Ct. App. 1977)). Aretakis has attributed malice to everyone involved in his arrest and criminal prosecution, including the Town Justice who recused himself from presiding as trial judge and the Special Prosecutor. Aretakis expounds upon a history of friction between him and Durivage ( the arresting and investigating officer), Nugent (the Special Prosecutor), Mr. and Mrs. Wells (the Complainants), and the entire Town of North Greenbush police force. Aretakis has not run short on alleging a litany of motives, spite, hatred, malevolence, and corruption that may constitute malice as to all of the individual Defendants. Although the existence of malice may also be inferred from the allegations, it is clear that malice and probable cause are independent elements, and "proof of one will not automatically result in an inference of the other in every case." *Arnold v. Town of Wilton*, 126 A.D.2d 135, 137 (N.Y. App. Div. 3d Dep't 1987).

Putting aside for the moment whether an issue of fact exists on the element of malice and

accepting that three of the four elements have been adequately pled, a failure to show a lack of probable cause from the inception of the prosecution becomes Aretakis's Waterloo on this cause of action as well. The linchpin of Defendants' challenge is Aretakis's inability to prove the lack of probable cause. *McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. Ct. App. 1983) (stating that "the absence of probable cause is an essential element of a claim for malicious prosecution"). As with false arrest, the existence of probable cause is a complete defense to a claim for malicious prosecution. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (citations omitted); *Raymond v. Bunch*, 136 F. Supp. 2d 71, 80 (N.D.N.Y. 2001) ("[A]s with claims for false arrest, the existence of probable cause is an absolute defense to a cause of action for malicious prosecution."); *see also Jennis v. Rood*, 488 F. Supp. 2d 172, 183 (N.D.N.Y. 2007) (citing, *inter alia*, *Savino v. City of New York*, 331 F.3d at 72).[16] We have already determined that Defendants had probable cause to arrest Aretakis (*see supra* Part II.C.2), and in the final analysis that finding is the *fait d'complit* for a successful malicious prosecution claim. *Donovan v. Briggs*, 250 F. Supp. 2d at 260. Much like dominoes, a failure to prove one element of a cause of action is the death knell for the entire cause of action. Under this development, though malice would create a question of fact in this case because of the failure to establish the lack of probable cause, such an element is now moot. *Broughton v. State*, 37 N.Y.2d at 459. Under these circumstances, a valid arrest and a subsequent prosecution will not be rendered unlawful regardless

---

[16] Aretakis cites *Colon v. City of New York* for the proposition that "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." 60 N.Y.2d 78, 82 (N.Y. Ct. App. 1983). But, the quote is out of context because it is a converse to the following: "[a] party may act with probable cause even though mistaken, for a mistake of fact as to the identity of a criminal may be consistent with probable cause if the party acted reasonably under the circumstances in good faith." *Id*. (citations omitted). *Colon* is a case that turns on identity whereas this case does not. However, what is more critical for Colon is that City of New York did not appeal the false imprisonment charge but neither was there a "concession that the arrest was made without probable cause." *Id*. at 84 (noted to show that Colon did not rebut the presumption of probable cause). Moreover, as we have found above, probable cause is reviewed under the totality of the circumstances.

of the potential existence of malicious motives.  *Id.*

We are still required to address Aretakis's assertion that Wells fabricated the evidence of the crimes of which Durivage and Nugent knew was false and fabricated and yet used it to prosecute him, and that Durivage fabricated and told untruths in his testimony.  Am. Compl. at ¶ 66; Aretakis Aff. at ¶ 29.  Other than these conclusory statements, nothing has been offered to establish that Durivage fabricated evidence or even lied.  Nor is there anything presented to support Aretakis's postulation that Durivage deliberately manufactured proof or falsified evidence.  There is nothing presented to support the allegation that Durivage and Nugent knew that Wells's version of the events was a lie.  We agree that fabricated or manufactured evidence cannot provide probable cause.  *Jocks v. Tavernier*, 316 F.3d at 138-39; *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  But what we have here are two different versions of the September 5, 2005 incident, which were presented to the jury, and Aretakis's version prevailed.  Prevailing at trial does not connote in any way that the investigating officer and the prosecutor manufactured or fabricated evidence, thus dissipating the presence of probable cause for the arrest.  Much more is required.[17]  Accordingly, we find that the claims of malicious prosecution and the corollary Fourth Amendment violation shall be dismissed.

### D.  Intentional Infliction of Emotional Distress

Aretakis's first cause of action pleads intentional infliction of emotional distress against the Defendants, jointly and severally.  Am. Compl. at ¶¶ 89-112.  The Amended Complaint promulgates that Defendants' intentional and outrageous conduct "was done because the Plaintiff was and is a

---

[17] Certainly the failure to engage in a comprehensive investigation does not constitute fraud.  "Nor do variation in witnesses' testimony prove perjury [or suborning perjury].  Rather, they appear to indicate only the witnesses' differing perception of the incidents they observed."  *Colon v. City of New York*, 60 N.Y.2d at 84.

person who advocated for, and complained about sexual abuse by clergy and has stood up and supported victims of clergy sexual abuse and has also made legitimate and accurate criticisms of police and elected officials, including elected officials in the Town and County in which the Defendants work and reside." *Id.* at ¶ 92.  Some of the alleged outrageous conduct includes filing false and fabricated charges, suborning and committing perjury, retaliation, and "punishing the Plaintiff for exposing predators and or for working for and with victims of abuse." *Id.* at ¶ 106.

There are four elements to the cause of action for intentional infliction of emotional distress: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. Ct. App. 1993).  This cause of action is highly disfavored under New York law, *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 345 (S.D.N.Y. 2000), and proving it is strict, "rigorous and difficult to satisfy," *Howell v. New York Post Co., Inc.*, 81 N.Y.2d at 122 (citation omitted); *Roach v. Stern*, 252 A.D.2d 488, 491 (N.Y. App. Div. 2d Dep't 1998) (the purpose is to filter out trivial complaints).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v. New York Post Co., Inc.*, 81 N.Y.2d at 122 (citing *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 303 (N.Y. Ct. App. 1983).  And, the alleged conduct must be "intentionally directed at the plaintiff and lack any reasonable justification." *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (1985).  Further, since intentional infliction of emotional distress does not have any proscribed specific conduct as compared to other common law actions, it should be invoked as a matter of last resort.  Thus, it is often "[p]recluded where the offending

*-30-*

conduct is embraced by a traditional tort remedy." *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d 269, 270 (N.Y. App. Div. 1st Dep't 1998) (citations omitted).

Aretakis does not provide facts that would support a charge of intentional infliction of emotional distress. Instead, he offers mere allegations in the complaint and even more conclusory statements in his opposing papers. Further, Aretakis has pled other causes of action which provide for recovery of emotional distress (*i.e.*, false arrest, malicious prosecution, constitutional violations). Consequently, since there is an overlap in other areas of law, Aretakis should be precluded from pleading intentional infliction of emotional distress. *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d at 270. Besides, a party should not be able to argue intentional infliction as an "end run around a failed [] claim," especially when Defendants acted within their legal rights. *Howell v. New York Post., Inc.*, 81 N.Y.2d at 125. Privileged conduct, without alleging more, cannot be the basis of liability under this theory. *Id*. at 125-26. Because we have found the presence of probable cause, Aretakis's arrest and his prosecution were privileged, thus, defeating a cause of action for intentional infliction of emotional distress. *Id*. at 125 (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d at 303, for the proposition that the "distinction between privileged and nonprivileged conduct as it relates to infliction of emotional distress is implicit in [New York] cases and explicit in the Restatement"). Hence, we find that Aretakis has neither stated nor proven a cause of action for intentional infliction of emotional distress.

### E.  Special Prosecutor Nugent and Absolute Immunity

As we noted above, on October 13, 2005, Nugent was appointed Special District Attorney, pursuant to New York County Law § 701, by New York State Justice James Canfield and continued

as such until Aretakis's acquittal.[18]  As a Special Prosecutor, Nugent asserts that he is entitled to absolute immunity for his conduct in prosecuting Aretakis.

Absolute immunity is limited to a "class of officials and functions." *Spear v. Town of West Hartford*, 954 F.2d 63, 66 (2d Cir. 1991) (citations omitted) (extending absolute immunity to executive branch of a municipality); *Arteaga v. State of New York*, 72 N.Y.2d 212, 217 n.1 (N.Y. Ct. App. 1988).  As a general legal proposition, absolute immunity is conferred upon prosecutors when a civil complaint regarding the prosecutor's role in the criminal process is initiated.  The law is well-settled in that "prosecutors sued under 42 U.S.C. § 1983 are entitled to absolute immunity from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process." *Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001) (internal quotation marks and citations omitted) (advocacy functions are protected).  The Supreme Court has stated that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74, & 280 (1993) (noting that those acts undertaken "must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made"); *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (commenting that the Supreme Court "has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified

---

[18] Aretakis raises that Nugent sought this appointment after the Rensselaer County District Attorney recused herself and Carmelo LaQuidera withdrew from his appointment.  Nugent denies seeking the appointment, but even if he did, such is not material to any discussion in this matter.

immunity side" (quoting *Buckley*, 509 U.S. at 273)); *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (stating that the official "is also [absolutely] immune for conduct in preparing for [initiating a prosecution or presenting a case for trial]; for example, evaluating and organizing evidence for presentation at trial or to a grand jury"). Qualified immunity, on the other hand, will attach if the prosecutor is instead acting in an investigative or administrative capacity. *Buckley v. Fitzsimmons*, 509 U.S. at 273-74 (holding that a prosecutor is not entitled to absolute immunity and can receive qualified immunity "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer"); *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004); *see also Parkinson*, 238 F.3d at 150. Courts then must examine the "nature of the function performed" in assessing whether absolute immunity will attach. *Blouin v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Thus, "[i]n determining which persons are covered by an extension of the immunity, the Supreme Court follows a functional approach, under which absolute immunity flows not from rank or title or location within the Government, but from the nature of the responsibilities of the individual official." *Oliva v. Heller*, 839 F.2d 37, 39 (2d Cir. 1988) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) (internal quotation marks omitted)).[19]

The sum of it all is that a prosecutor, who acts within his official capacity, is immune from suits for malicious prosecution as well as any Fourth or Fourteenth Amendment violations. *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997) ("The policy considerations that justified the common-law decisions affording absolute immunity to prosecutors when performing traditional functions applied

---

[19] The United States Supreme Court recently handed down *Van de Kamp v. Goldstein*, _U.S._, 2009 WL 160430 (U.S. Jan. 26, 2009), wherein they discussed not only the history and the public policy supporting a prosecutor's absolute immunity, but reinforcing the principle that absolute immunity attaches whenever the questioned conduct bears on the prosecutor's exercise of legal knowledge and relates, even remotely, to his quasi-judicial role.

equally to statutory claims based on the conduct of the same functions."); *Imbler v. Pachtman*, 424 U.S. 409, 427-28, 432 (1976) (confirming that a prosecutor receives the same absolute immunity under § 1983 that he would enjoy at common law); *Shmuell v. City of New York*, 424 F.3d 231, 238 (2d Cir. 2005) (absolute immunity protects against prosecution claims brought under state law).  The Supreme Court made it pellucidly clear that absolute immunity

> does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.   But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest.  It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

*Imbler v. Pachtman*, 424 U.S. at 427-28.

In an attempt to perform an end run around the dispositive nature of absolute immunity in this case by casting some if not all of Nugent's acts as administrative and investigatory, Aretakis has leveled a plethora of allegations against Nugent.  We will discuss them *seriatim*.[20]

Aretakis emphatically states that Nugent used false testimony and suborned perjury.  As a companion allegation, Aretakis alleges that Officer Durivage perjured himself.  What is most perplexing is that, even though Aretakis tars and feathers these officials with these serious allegations, he does not identify what testimony was perjured or how Nugent suborned perjury. What he has presented is a litany of conclusions that may shock but have no evidentiary intrinsic meaning.  Of course, Nugent and Durivage deny these conclusory allegations as specious.  But it is clear that both Nugent and Durivage are entitled to absolute immunity, denials notwithstanding. The United States Supreme Court made this point very clear in Imbler v. Pachtman, that the

---

[20] Although we did not discern this with Aretakis's Amended Complaint, Nugent is concerned that Aretakis may have sued him in his official capacity as well. Dkt. No. 53-13, Nugent Mem. of Law at p. 8.  We agree with Nugent that if he was sued in his official capacity, a recovery of monetary damages would be precluded by the Eleventh Amendment of the United States Constitution. *Kentucky v. Graham*, 473 U.S. 159 (1985).

prosecutor was absolutely immune from civil suits even where a civil complaint, much as Aretakis has done here, has a claim that the prosecutor used false testimony. 424 U.S. 409. In fact, it is seminal law that "[a] prosecutor is also entitled to absolute immunity despite the allegations of his knowing use of perjured testimony and the deliberate withholding of exculpatory information." *Shmuell v. City of New York*, 424 F.3d at 237 (quoting *Imbler v. Pachtman*, 424 U.S. at 431 n.34); *Johnson v. Town of Colonie*, 102 A.D.2d 925, 926 (N.Y. App. Div. 3d Dep't 1984) (absolute immunity exists even when it is alleged that the assistant district attorney continued to prosecute a matter despite his personal knowledge that the plaintiff had not committed the crime of forgery). Additionally, Durivage, a police officer, is immune from liability under § 1983 for testifying falsely at trial. *Linder v. New York State Police*, 2007 WL 1288027, at *2 (N.D.N.Y. Apr. 30, 2007) (citing *Briscoe v. LaHue*, 460 U.S. 325, 330-32 (1983)). And, in this respect, Wells, who also has been accused of rendering perjurious testimony, is cloaked by absolute immunity for his testimony. *Brisco v. LaHue*, 460 U.S. at 330-32 (providing the history of witness immunity that was well established in English common law).

Similarly, Aretakis argues that Nugent acted in an investigatory manner when he interviewed eye witnesses to the incident, Dave Mulino, and Mr. and Mrs. Wells. If Nugent acted as an investigator, he would not be cloaked with absolute immunity, but he may be entitled to qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. at 273. Nugent admits to interviewing these witnesses but he proclaims that he did so in preparation for trial. He avers that by the time he assumed his prosecutorial role the matter had been investigated by the North Greenbush Police Department. Dkt. No. 53-7, Nugent Aff. at ¶¶ 7-9. Under this scenario, the law of absolute immunity favors Nugent. Once again the United States Supreme Court instructs us that

an out-of court effort to control the presentation of a witness' testimony was entitled to absolute immunity because it was fairly within the prosecutor's function as an advocate . . . . We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial[.]

*Buckley v. Fitzsimmons*, 424 U.S. at 272-73 (citations, alterations, and quotation marks omitted).

Next, Aretakis states, relying primarily upon opinions posited by his wife who served as town justice and holds herself as a legal expert on these types of criminal matters, that Nugent violated his rights by not offering a plea negotiation. Because of the nature of the charges and his impeccably crime-free credentials, Aretakis complains that Nugent should have offered him a plea disposition that encompassed an adjournment in contemplation of dismissal. His wife further posits that in all of her years as a judge and as a lawyer she has never seen a matter such as this prosecuted to the fullest extent of the law, and additionally pronounces asa prosecutor's ecumenical catechism as to what would constitute proper prosecutorial conduct that Nugent should have offered Aretakis such a plea agreement. Failing to due so, Cholakis opines that Nugent violated Aretakis's due process rights.[21] Cholakis Aff. at ¶ 15. Nugent denies withholding plea negotiations from Aretakis,[22] but even if he did, it would be of little moment under these facts. Engaging in plea

---

[21] A cause of action claiming a due process violation can be found within the second cause of action, albeit barely stated. *See infra* Part II.F.

[22] Contrary to both Aretakis's and Cholakis's postulations, Nugent asseverates that

[a]s a matter of fact, during the pendency of the prosecution and prior to trial, [he] had eliminated the prospect of an adjournment in contemplation of dismissal as a disposition of the case. . . . [D]uring a pre-trial telephone conference between the Judge, [Nugent], and Nia Cholakis, Mr. Aretakis's then attorney, the Judge raised the possibility of a negotiated disposition. [Nugent] responded that defense counsel had previously indicated that the defendant would only accept an adjournment in contemplation of dismissal. Whereupon, defense counsel stated that what she had said was that defendant would only consider an adjournment in contemplation of dismissal. She then stated: "Now my client wants his day in court." There was no further discussion regarding a negotiated plea after that conference.

(continued...)

-36-

bargaining is a discretionary function of a prosecutor.  Accordingly, when a prosecutor acts or declines to act within the context of plea bargaining, his decision-making merits the protection of absolute immunity.  *Doe v. Phillips*, 81 F.3d 1204, 1210 (2d Cir. 1996) (citing *Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir. 1981)); *Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995) (finding that prosecutor's action regarding plea agreements is covered by absolute immunity).  Such a legal privilege remains in effect no matter the motivation "because the negotiation of a plea bargain is an act within a prosecutor's jurisdiction as a judicial officer."  *Doe v. Phillips*, 81 F.3d at 1210.  But, speaking of ill motivations, Aretakis contends that Nugent sought to prosecute him for political advancement, or to gain a feather in his cap for attempting to earn a conviction against a high profile lawyer, or, to burnish his standing with the Catholic Church.  *See* Cholakis Aff. at ¶¶ 15, 16, & 19-24; Aretakis Aff. at ¶¶ 31, 32, 36, & 60-62; *see generally*, Aretakis Dep.  However, absolute immunity shields a prosecutor in the performance of his quasi-judicial functions, "regardless of any political motivation."  *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004).

There is also an allusion that Nugent was involved in both an out-of court and within-court conspiracy to deprive Aretakis of his constitutional rights.  Since there is a conspiracy cause of action pled within the Amended Complaint, it appears that Aretakis, by pleading a conspiracy, is attempting to maneuver around the absolute immunity.  But, the Second Circuit, resting upon Supreme Court precedents, once again, made evidently clear that whether the prosecutor acts within or outside the courtroom, as long as it a part of his prosecutor's role, he has a safe harbor within the confines of absolute immunity.  *Van de Kamp v. Goldstein*, _U.S._, 2009 WL 160430 (U.S. Jan. 26,

---

[22](...continued)
Dkt. No. 53-7, Nugent Aff. at ¶ 13.

When given the opportunity, neither Aretakis nor Cholakis refuted Nugent's sworn statement.

2009); *Pinaud v. County of Suffolk*, 52 F.3d at 1148; *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) ("[S]ince absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity.").

Lastly, which is extraordinary in and of itself, Aretakis assails Nugent for an "extraordinary act of malfeasance and illegality." Aretakis Aff. at ¶ 33. Aretakis boldly submits that Nugent had his private counsel, Robert Roche, call the Trial Judge and attempt to have the Judge deny him a fair trial. Am. Compl. at ¶ 35. Supporting this provocative allegation with nothing more than convoluted logic, Aretakis posits that "Nugent does not deny his lawyer acted on behalf of Nugent and Nugent does not address this illegal act enacted on his behalf." Aretakis Aff. at ¶¶ 33-34. But the record is more telling than what Aretakis may infer. *See* Dkt. No. 68-4, Ex. A, Judge Toomey Trial R., dated June 7, 2006.

On June 7, 2006, while the criminal trial was pending, the Trial Judge, the Honorable Paul G. Toomey, placed on the record that Robert Roche, Esq., had called him at home on Saturday, June 3rd. Apparently, Judge Toomey went to school with Attorney Roche's son, but had only infrequent contact with Attorney Roche. Upon returning Roche's call, the two exchanged pleasantries and then Roche said that he had a client who had a case pending before the Town of Sand Lake, meaning Judge Toomey, which possibly had commenced earlier that week. "Mr. Roche was concerned whether he was, if he going to an area that I could go into." *Id*. at p. 4. Since the trial was public, Judge Toomey told Roche that Aretakis's criminal case commenced on that Thursday and the People rested its case. This telephone call appeared to have been rather abbreviated: "Mr. Roche asked nothing further about the case . . . . I offered nothing further. *Id*. We had a short

conversation about his son, my classmate from Christian Brothers Academy, and that was the end

of that conversation." *Id*. After the Judge spoke, on the record, Aretakis identified Mr. Roche as

"my adversary involved in this clergy sexual abuse area." *Id*. at p. 6. The call raised some concerns

for everyone but Aretakis realized that "the Court [had] fully disclosed things." *Id*. Judge Toomey

reiterated, "[Roche] never asked me to go beyond that. I never offered to go beyond that, and that

was the end of the conversation[.]" *Id*. at p. 7. Then Judge Toomey invited Aretakis to make any

argument, motion or statement that he liked. As a part of his statement to the court, Aretakis stated

that "the Court acted appropriately [and] [y]ou disclosed that, and I appreciate that." *Id*. at p. 8.

Later, on the record, Aretakis inquired, "Did Mr. Roche make any negative connotation about me

or towards me?" To which the Court replied, "[n]one whatsoever." *Id*. at p. 9.

In his defense, Nugent says that he did not ask Mr. Roche to make any telephone call on his

behalf to Judge Toomey, and, to the best of his knowledge, Attorney Roche was not at the time his

attorney. Dkt. No. 68-4, Timothy Nugent, Esq., Aff., dated June 12, 2008, at ¶ 3. As it appears, on

May 31, 2006, Aretakis personally served Nugent with a Summons with Notice, regarding a former

client of Nugent. The Summons was faxed to Nugent's insurance carrier, who hired Roche's law

firm to represent Nugent on this matter. Nugent was notified of the appointment nearly a week after

the infamous telephone call and, on June 12th spoke with Scott Bush, Roche's law partner, who was

assigned to represent Nugent. *Id*. at ¶¶ 9-12.

Neither in his Amended Complaint nor his Affidavit, does Aretakis demonstrate any proof

that Nugent actually asked Roche to make that telephone call. Instead, he relies upon a naked,

unreliable assumption that Nugent did and, because of this unsubstantiated reliance, this complaint

must fail. Yet, if we were to give Aretakis the benefit of the doubt, once again, Nugent would be

shielded from civil liability by absolute immunity.  As we may remind the parties, absolute immunity may leave a genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.  *Imbler v. Pachtman*, 424 U.S. at 427-28 (further noting that the only remedy that may be available to such an aggrieved party is the filing of criminal charges against an errant prosecutor); *Dorman v. Higgins*, 821 F.2d at 139 (ruling that neither bad faith or malice, while done in his official capacity, defeats absolute immunity).  Further compromising  Aretakis's position on this event is the simple notion that Aretakis was neither prejudiced nor damaged in light of his acquittal after trial.

### F.  Second Cause of Action

This is a peculiarly pled cause of action, which caused this Court tremendous difficulty to decipher.  Am. Compl. at ¶¶ 113-35.  Rather than one well defined cause of action, we are treated to a lumped together series of allegations and complaints.  Because of the number of purported violations listed, we are lead to believe that the Second Cause of Action was meant to serve as a cornucopia of common law and constitutional violations.  The cause of action begins with all of the Defendants being jointly and severally liable for "violation of Plaintiff's First Amendment and Constitutional rights of free speech and Title VII of the Civil Rights Act of 1964 based on his religion, his work and his outspoken criticisms and in violation of 42 U.S.C. § 1983." *Id*. at ¶ 114.  But reading further into this cause action, we find that Aretakis also complains that Defendants' actions clearly denied him due process.  *Id.* at ¶¶ 117-18.  Continuing still, there appears to be an allegation that Aretakis's Fourteenth Amendment right to equal protection was violated: "If an individual is selectively treated based on an impermissible consideration such as religion or to punish in the exercise of constitutional rights or malicious bad faith to injure a person, then claim

for this violation exists." *Id*. at ¶ 120.  Allegedly, the discrimination is "based on the Plaintiff's class

of being an advocate of victims of childhood sexual abuse and not being a Catholic . . . [and] . . .

because he is an attorney opposing and filing actions against Catholic priests and the Plaintiff is not

Catholic." *Id*. at ¶¶ 133-34.  Later in this cause of action, it is pled that Nugent and Durivage

conspired to deprive him of his constitutional rights. *Id*. at ¶¶ 126-28.[23]  We are confounded as to

which of these causes of action takes priority or should be addressed first.  We will begin with Title

VII.

### 1.  Title VII of the Civil Rights Act of 1964

For unknown reasons, Aretakis cites to Title VII of the Civil Rights Act of 1964.  42 U.S.C.

§ 2000e.  Even the Defendants are befuddled as to whether this is considered a separate cause of

action or even how this statutory reference actually means something in the context of this case.

Possibly, Aretakis cites to this provision of the law for the purpose of identifying his claims of

retaliatory actions.  Such a citation is misplaced inasmuch as Title VII forbids unlawful **employment**

practices by an employer, such as employment discrimination based on race, color, religion, sex, or

national origin and/or retaliation based upon discrimination against an employee or job applicant.

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. §

2000e-2(a) (unlawful employment practices) and 3(a) (other unlawful employment practices)).

Here, Aretakis has pled no facts that any of the Defendants was his employer.  With that essential

element missing within the framework of this litigation, a Title VII action has not been properly

---

[23] Although there is no specifically delineated cause of action for conspiracy, the Amended Complaint does periodically mention that a conspiracy existed between Wells, Nugent, Durivage, the Catholic Church, the Church's attorney, and the Town of North Greenbush.  Am. Compl. at ¶¶ 77, 104, 112, & 126-28; Aretakis Aff. at pp. 9-11 & 31. If we also include the prefatory prose, "Defendants acted jointly and severally," we may reasonably infer that the Amended Complaint intended to include a cause of action for conspiracy.

pled.

### 2.  Due Process Pursuant to the Fourteenth Amendment

Next we address Aretakis's complaint that he was denied Due Process under the Fourteenth Amendment of the United States Constitution.  Section 1 of the Fourteenth Amendment states that a state shall not deprive a person of life, liberty, or property, without due process of law.  Yet, we are bedeviled in determining as to how a due process claim has been correctly pled in this case.  Are we to presume that the fact that Aretakis was arrested and had to endure a trial creates the denial of either procedural or substantive due process?  Asking this question rhetorically belies the viability of the claim.  In this context, presumably this claim is yet another vain grasp at the proposition that Nugent's failure to offer a plea disposition constituted a denial of due process as Aretakis's wife proffers.  If there is fact that we can rest assured is presented in the Amended Complaint and all of the other motion submissions, it is that Aretakis received full due process.  Procedurally, he was represented by counsel, given notice of the charges against him, given an opportunity to file appropriate motions, had an opportunity to challenge the proof against him by cross examining witnesses before a jury comprised of a fair cross section of the community, allowed to present proof in support of his version of the case, and, most importantly, a jury deliberated and **eventually acquitted him**.  Obviously, his procedural due process rights were fully exploited.

Maybe Aretakis's claims of false arrest and malicious prosecution also amount to a violation of his substantive or procedural due process rights under the Fourteenth Amendment.  In this respect we turn to *Albright v. Oliver*, 510 U.S. 266 (1994), for guidance.  In *Albright*, the plaintiff alleged, in addition to false arrest, that the defendant deprived him of substantive due process under the Fourteenth Amendment – that is, he was deprived of his liberty interest to be free from criminal

prosecution except upon probable cause.  Except in *Albright*, even though the courts found no probable cause, the Supreme Court would not hold that a constitutional tort of substantive due process was present unless "accompanied by incarceration, loss of employment, or some other palpable consequence."  *Id*. at 269 (citation and internal quotation marks omitted).  Rather than expand the concept of due process, the Supreme Court noted that it is the Fourth Amendment and not substantive due process which is the applicable constitutional right affronted in these types of matters.  *Id*. at 271-72; *see also Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997) ("[D]eprivations of liberty that go hand in hand with criminal prosecutions have Fourth Amendment relevance.") (internal quotation marks and citations omitted)).

Accepting that Aretakis was arrested and had to endure a criminal prosecution, those pretrial deprivations of liberty and other substantive due process rights were subsumed into the Fourth Amendment.  All other listed injuries, quite frankly, are damages suffered by the deprivation of a Fourth Amendment right.  However, we have already determined that there was no Fourth Amendment violation in light of the presence of probable cause, accordingly any substantive due process rights under the Fourteenth Amendment have also been resolved.  *See supra* Part II.C.

### 3.  First Amendment Rights

Speaking of anomalistic pleading, Aretakis pleads an infringement of his First Amendment Right of free speech in both the second and seventh causes of action.  Am. Compl. at ¶¶ 114, 116, 132, & 183-87.  As an iteration throughout the Amended Complaint, Aretakis states that the Defendants were aware of the Catholic Church's strategy to silence and chill his speech and that they essentially joined forces with the Catholic Church to abridge his rights under the First Amendment.  His arrest and prosecution had "the effect of abridging and chilling [his] First

Amendment freedom of speech and providing his clients with effective assistance of counsel." *Id.* at ¶ 132.  In opposition to the Summary Judgment Motions, Aretakis further states that "[b]eing arrested in a high profile manner, and prosecuted falsely for nine month[s] actually chilled [his] free speech and advocacy for [his] clients. [He] did not make any speeches during this time as was [his] custom, and [he] lowered the profile of clergy sexual abuse cases [he] was handling during this time."  Aretakis Aff. at ¶ 19.

To prevail on a free speech claim, a plaintiff must prove (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)).  Here, Aretakis has failed to allege sufficient particularity to support each of these elements.  *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995).

We agree that Aretakis has a protected First Amendment right, as all free American citizens enjoy, but he cannot show that the arrest and prosecution of him were caused or motivated by his exercise of that right.  The records show that he was arrested for harassment and petty larceny, not for exercising his First Amendment rights.  Nonetheless, because we have already found that Aretakis was arrested and prosecuted based upon probable cause, an inquiry into Defendants' motive "need not be undertaken." *Curley v. Vill. of Suffern*, 268 F.3d at 73 (citing, *inter alia*, *Mozzochi v. Borden*, 959 F.2d 1174, 1179-80 (2d Cir. 1992).  Further, as a private citizen, Aretakis would have to establish that his First Amendment rights were actually chilled.  *Id.*; *compare with Morrison v. Johnson*, 429 F.3d 48 (2d Cir. 2005) (a public employee does not have to show actual chill); *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004) (noting that, based upon party's status, there are varying

-44-

line of first amendment standards). In order to show an actual chill, there must be proof of a change

in behavior, *Curley v. Vill. of Suffern*, 268 F.3d at 73, because a subjective chill cannot serve as a

substitute for a specific objective harm, *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). At best, Aretakis

asserts that he was temporally deterred from speaking while the criminal prosecution was pending

because he did not want to raise his profile to a potential jury pool. Aretakis Aff. at ¶¶ 19-20. This

is insufficient to support the claim that Defendants' conduct actually chilled him from speaking on

any issue that he pleased. In actually, Aretakis finds himself in the same situation as the plaintiff

in *Curley v. Vill. of Suffern*. In *Curley*, the plaintiff was running for office. He claimed that his

arrest demoralized him to such an extent that he made a token effort in his campaign. But, in

recognizing that he had not been actually chilled, the Second Circuit noted that, notwithstanding the

arrest, he still chose to run for public office. 268 F.3d at 73. In the final analysis, Aretakis cannot

prove two of the salient elements for a First Amendment violation and thus he has failed to state a

cause of action.

### 4. Equal Protection of the Law

Also within the Second cause of action, Aretakis claims that his equal protection rights under

the Fourteenth Amendment were violated inasmuch as he was selectively treated differently on

impermissible considerations of religion. Am. Compl. at ¶ 120. He continues by contending that

he was discriminated because of his "class of being an advocate of victims of childhood sexual

abuse and not being Catholic." *Id*. at ¶¶ 133-34. In his Memorandum of Law, Aretakis further

extrapolates on his contention:

> [P]ursuant to a conspiracy, Defendants agreed to selectively enforce and seek to
> prosecute Plaintiff because he was an antagonist and critic against the Catholic
> Church as well as public officials who belong to or have assisted the Church, and
> because he was the leader and attorney for victims of clergy sexual abuse. . . . It is

> not a coincidence for a frivolous prosecution against an attorney with a spotless
> criminal record to have occurred.

Dkt. No. 62-6, Aretakis Mem. of Law at p. 28.

The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988) (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985)). As a general rule, the equal protection clause protects suspect classes and fundamental rights against inequitable treatment. *LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir. 1980) (citing *Dandridge v. Williams*, 397 U.S. 471, 487 (1970) (equal protection clause is primarily concerned with classes and groups)). To establish selective prosecution, a plaintiff must show that he, compared with others similarly situated, was selectively treated and that such selective treatment was based on an impermissible consideration such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious intent to injure him. *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005). The mere failure to prosecute other offenders is not a basis for finding a denial of equal protection. *LeClair v. Sanders*, 627 F.2d at 608.

What we have here is a failure of proof. Although Aretakis may have pled the magic words, there is nothing in the record to show that any Defendant discriminated against him because he was an advocate on behalf of victims of clergy sexual abuse, a critic of the Catholic Church, or personally non-Catholic. He is proceeding on the notion of a coincidence. He is unable to show that others have not been prosecuted for harassment or petty larceny because they were advocates, may have been critics of the Church, or non-Catholics. He cannot establish that he was prosecuted because he exercised any of his constitutional rights. Nor are there any facts to support that he was selectively treated based upon impermissible consideration or malice. Actually this claim defies

legal logic.  Under the facts as found in the record, how can Aretakis's Fourteenth Amendment right

to equal protection be violated when his Fourth Amendment right was not because of the presence

of probable cause?  Durivage had a legal basis to arrest him and Nugent had a legal basis to

prosecute him, thus no basis for selective treatment exists.  The facts are insufficient to support an

intent to discriminate on any basis and no reasonable juror would conclude that Aretakis could prove

these allegations.[24]  *Garden City Ctr. Assoc. v. Inc. Vill. of Garden City*, 189 F.3d 460 (2d Cir. 1999)

(unpublished opinion).

### 5.  Conspiracy

A cause of action pleading a conspiracy to violate Aretakis's constitutional rights is not

deposited within a single cause of action but sprinkled throughout the Amended Complaint.  Am.

Compl. at ¶¶ 104, 112, 126, & 127.[25]  We have already mentioned the presence of a theory of

conspiracy so this would be a good moment to discuss it now.  *See supra* note 23.

The Amended Complaint states that the Defendants conspired (1) to conceal their

misconduct (¶ 104), (2) to have Aretakis investigated on false charges and made false claim against

him (¶ 112), (3) to deprive him of his constitutional rights and conduct a cover-up (¶ 126), and (4)

to submit and suborn perjury and fabricated charges (¶127).  Extrapolating further on the claim of

a conspiracy, Aretakis argues that the Defendants and possibly others like the police and the

---

[24] Proving selective treatment under the equal protection clause is very difficult and a rather rare occurrence. We note that the actual findings by the Second Circuit in those cases cited by Aretakis did not find selective treatment. In fact, the Circuit noted that the legal theory of selective treatment has a rather limited history and a thin roster of precedents. *See LeClair v. Sanders*, 627 F.2d 606, 608 (2d Cir. 1980) (selective enforcement or treatment is a "murky corner of equal protection law in which there are surprisingly few cases" and "equal protection does not require that all evils of the same genus be eradicated or none at all"); *see also Zahra v. Town of Southold*, 48 F.3d 674 (2d Cir. 1995) (claim denied)*; Brady v. Town of Colchester*, 863 F.2d 205, 216 (2d Cir. 1988).

[25] We also construe multiple iterations that Defendants acted jointly as a maladroit effort to plead a conspiracy. *See supra* note 23.

Catholic Church, conspired to maliciously prosecute him and violate his rights. Aretakis Mem. of Law at pp. 24-27; *see generally* Dkt. No. 53, Aretakis Dep.  In supporting this claim, Aretakis contends that the Catholic Church attempted to utilize the criminal courts to "gain an advantage or injure" him in their civil actions against him and that Durivage and Nugent utilized Wells's criminal complaint "to advance or pursue their own bias, animus, or ulterior motive against [him]."  Aretakis Mem. of Law at p. 26.[26]

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted); *Taylor v. Hansen*, 731 F. Supp. 72, 78 (N.D.N.Y. 1990).  Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed.  "Diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct."  *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).

> To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.  *Spear v. [Town of West Hartford]*, 954 F.2d [63], 68 [2d Cir. 2002].  Put differently, a private actor acts

---

[26] Aretakis contends that the alleged conspiracy's genesis begins with his arch nemesis the Catholic Church. Presented in a linear fashion, Aretakis postulates that the Catholic Church has been filing fallacious complaints and allegations against him for years; in this instant scenario, the Church had its agent, Attorney Michael Costello, to hire Wells, a process server, with the purpose of setting him up; following the Church's direction Wells created a scene with the intent of filing bogus criminal charges against him; and Defendant Town, Durivage, Nugent, and possibly the Town Justice, joined the cabal, to violate his rights and maliciously prosecute him.  Ironically and peculiarly absent as Defendants in this lawsuit are the purported chief architects of the conspiracy - the Catholic Church and Attorney Michael Costello.

under color of state law when the private actor is a willful participant in joint activity with the State or its agents. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)).  A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.  *Spear*, 954 F.2d at 68.

*Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (internal quotation marks omitted); *Singer v. Fulton County Sheriff*, 63 F.3d at 119 ( indicating that in order to prove a § 1983 action, there must be a showing that person acted under color of state law and either "collaborated or conspired with a private person . . . to deprive the plaintiff of a constitutional right").

The above recitation of the law on conspiracy requires us to address Wells's argument that he is not a state actor and therefore cannot be liable under § 1983.  Dkt. No. 50-4, Wells Mem. of Law at p. 3.  We agree that as a general legal proposition Wells is not a state actor, and, standing alone, may immune him from liability on the myriad of independently stated constitutional violations.[27]  In order to bring a § 1983 action a person must be acting under the color of state law. We can definitely state, on these facts, Wells is not a public official nor could he act under the color of state law in causing an arrest and a prosecution.  Supplemental to this finding we note that Wells, as a witness, has absolute immunity from damages based upon his trial testimony.  *San Filippo v. United States v. United States Trust Co. of New York*, *Inc*., 737 F.2d 246, 254 (2d Cir. 1984) (citing *Briscoe v. LaHue*, 460 U.S. 325 (1983)); *Taylor v. Hansen*, 731 F. Supp. at 75-76 (witness who perjured his testimony is absolutely immune).  However, as we have learned from the above discourse of what is necessary to plead and prove a conspiracy, private actors can be implicated into

---

[27] Wells further argues that when this matter was with Judge Scheindlin before being transferred to this District, the good Judge had ruled that Wells was not a state actor with respect to federal claims and that the Amended Complaint should be further amended to exclude Wells as a party under that theory. Dkt. No. 50-4, Wells Mem. of Law at p. 3-4. Therefore, the only claims that could be pled against Wells would be the state common law causes of action.  *Id.* at p. 4.  Where this is true, we would be bound, in some respect, by the law of the case doctrine.  However, we are unable to confirm, either from the case docket or the record before us, Wells's position that Judge Scheindlin ruled in that fashion. Rather Judge Scheindlin's Order transferring the case states in part that the "[c]lerk of the court is therefore directed to transfer this case immediately to the Northern District of New York and to close this case and all outstanding motions in the Southern District of New York. . . . [A]ll existing briefing schedules are hereby stayed pending approval or modification by the Northern District of New York." Dkt. No. 33, Order, dated Dec. 7, 2007 at pp. 1-2.

a federal conspiracy if the elements and the proof has been met. *Ciambriello v. County of Nassau*, 292 F.3d 307; *San Filippo v. United States Trust Co. of New York*, 737 F.2d at 256 (noting that without a conspiracy, a defendant who may have given false testimony or made a false charge is not acting under the color of state law).

In our case, in addition to the paucity of proof to support a conspiracy, there are several seminal legal principles that countermine Aretakis's claim of a conspiracy. As to Special Prosecutor Nugent, we have already found that he has absolute immunity from liability. *Burns v. Reed*, 500 U.S. 478, 490 (1991) (further finding immunity extends to "eliciting false and defamatory testimony from witnesses"); *see supra* Part II.E. Moreover, immunity protects a prosecutor who knowingly used perjured testimony or deliberately withheld exculpatory information. *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993). Further, Officer Durivage, like Wells, is immune from damages for giving perjured testimony at Aretakis's trial. *Rolon v. Henneman*, 517 F.3d 140, 145 (2d Cir. 2008). So, on this account, if the conspiracy unfolded within a judicial proceeding, all Defendants are protected. In addition, because of the presence of probable cause, we have found that there was no false arrest, malicious prosecution, nor constitutional violation. Furthermore, there is neither a First nor Fourteenth Amendment violation in this case. If there is no underlying constitutional violation, there can be no § 1983 cause of action for conspiracy. *Pangburn v. Culberston*, 200 F.3d at 72 ([A] conspiracy requires, *inter alia*, an agreement . . . to act in concert to inflict an **unconstitutional** injury.") (emphasis added); *Curley v. Vill. of Suffern*, 268 F.3d at 72 (could not establish false arrest or use of excessive force); *Singer v. Fulton County Sheriff*, 63 F.3d at 119 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) for the proposition that a conspiracy lawsuit "will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal

right").[28]

Even though there is no constitutional violation in this case for the various reasons stated above, we note that, though it is not clearly stated, there is an allegation floating around the edges of the Amended Complaint that there was an out of court agreement between Wells, Durivage, and Nugent for Wells to testify falsely.  Under this conspiracy claim, and if true, absolute immunity may not exonerate Wells, Durivage, or Nugent.  *San Filippo v. United States Trust Co. of New York, Inc*., 737 F.2d at 255 (stating that *Briscoe v. LaHue*, 460 U.S. 325, did not extend absolute immunity to cover extra-judicial conspiracies between witnesses and prosecutor to give false immunity); *Taylor v. Hansen*, 731 F. Supp. at 76-77 (extending the reasoning of *San Filippo* to include extra-judicial conspiracy between police officers).  Yet, we further found that Nugent always acted within his quasi-judicial capacity, that is, he never acted outside the purview of his official duties.  In this respect, the claim of conspiracy has been seriously limited.

We have also been instructed that "it is imperative for courts to examine with great care any suit charging that prosecution witnesses conspired with the prosecutor, and to dismiss on pre-trial motions those that are clearly baseless."  *San Filippo v. United States Trust Co. of New York*, *Inc*., 737 F.2d at 256; *Dory v. Ryan*, 999 F.2d at 683 (warning that "§1983 suits against prosecutors and witnesses alleging conspiracies to commit perjury must be carefully scrutinized to weed out meritless claims").  Here we have only conclusory and general allegations within the Amended Complaint that these parties engaged in a conspiracy to violate Aretakis's rights.  Even with the promiscuous and expansive allegations in his Affidavit and Memorandum of Law, some of which

---

[28] Analogous to our facts, the plaintiff in *Maliha v Faluotico*, alleged that defendants falsified documents, exaggerated the evidence, made slanderous statements, and gave false testimony.  286 Fed. Appx. 742 (2d Cir. 2008). The Second Circuit nonetheless ruled that since there was probable cause, the plaintiff's claims against his wife, an alleged co-conspirator, were properly dismissed because plaintiff's arrest was constitutional.  *Id.*

is addled  speculation, Aretakis has failed to amplify with specific instances of conspiratorial misconduct.  The allegations are unsubstantiated and thus insufficient under either a Rule 12(b)(6) motion or a motion for summary judgment.

### G. Municipal Liability - Failure to Supervise, Failure to Train, and Policy and Practice

In some respect, the third and fourth causes of action, failure to train and supervise, are fairly synonymous, so we will address them together.  Am. Compl. at ¶¶ 138-150 & 151-59.  In the third cause of action, Aretakis pleads that Defendants, without specifically identifying whom ("Defendants and all of them), failed to properly train police officers "on how to deal with a situation wherein a person was falsely charged."  *Id*. at ¶ 138.  However, Aretakis makes an astoundingly curious allegation by implicating "governmental officials and **also those involved in political activity,**" without identifying to whom this is referencing, as well as the named Defendants, for failure to properly train their officers.  *Id*. at ¶ 140 (emphasis added).  As to the fourth cause of action, Aretakis claims that Defendants "were negligent in their failure to supervise." *Id.* at ¶ 152.  Although, as pled, these causes of action lack clarity as to who should be the target of these allegations, we can reasonably presume that the crux of these causes of actions are directed at the Town of North Greenbush and possibly Rensselaer County, though the latter has not been named in this action.

Aretakis hyperlinks the named Defendants and others to an all-encompassing theory of municipal liability in a rather peculiar and novel fashion:

> Defendant Rensselaer County is liable because it maintains a policy of not supervising a Special Prosecutor, and authorizing arrests without reviewing probable cause, the merits of the case, and whether the ends of justice are such that a criminal suspect should be arrested and prosecuted . . . Defendant Nugent is also liable for maintaining such a policy.  The Defendant North Greenbush have long standing policy, custom, and practice of treating Plaintiff unfairly and selectively enforcing

law against him[.]
Aretakis Mem. of Law at p. 9.[29]

Further, although not specifically described in the Amended Complaint, Aretakis alleges that the

Defendants "have had a policy of not only harassing the Plaintiff and treating him unfairly, but also

working with and protecting the Albany Diocese and its priests . . . because Bishop Hubbard [who]

has been the Bishop of Albany for 30 years as of February 2007 . . . has wielded power and

influence over his process server Robert Wells [and Michael Costello, his private counsel for over

two decades] . . . to instigate and pursue false charges[.]" *Id*. at p. 19.  Lastly, albeit not set forth in

the Amended Complaint,  Aretakis provides a string of personal contacts with Town of North

Greenbush officials and police officers over the past five years where they have either threatened

him, failed to protect him against threats, or failed to investigate threats made against him, and that

there was a continuing pattern and policy of repeatedly subjecting him to traffic stops.  Aretakis Aff.

at ¶¶ 38-54.[30]

---

[29] Presumably, with respect to Rensselaer County and Nugent, Aretakis notes as background that Nugent "had no immediate supervisor."  Aretakis Mem. of Law at p. 10.

[30] For Aretakis, the motivation is political:

Concerns of this case also involve a public policy as to political activities of (local) police officers. In a country where free speech and political activities are greatly protected, a police officer who arrests an individual perceived to be a political opponent or an individual with an adversarial history to that officer may credibly argue that the criminal law or enforcement of same is tainted.

Aretakis Aff. at ¶ 61.

1.  Rensselaer County and Nugent

The charges against Rensselaer County and Nugent are fundamentally flawed for several reasons.  First, Rensselaer County is not a named Defendant and, moreover, cannot conceptually be so named under any theory of law that may be applicable to this litigation.[31]  The Court notes, which is applicable to several of Aretakis's claims, that opposition papers are not the proper vehicle to instill new causes of action or add new defendants.  *See Devinsky v. Kingsford*, 2008 WL 857525, at *5 (S.D.N.Y. Mar. 31, 2008) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment.") (quoting *Beckman v. United States Postal Serv.*, 79 F. Supp. 2d 394, 407-08 (S.D.N.Y. 2000)); *In re Private Capital Partners, Inc.*, 139 B.R. 120, 124-25 (Bankr. S.D.N.Y. 1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)); *Harvey v. New York City Police Dep't*, 1997 WL 292112, at *2 n.2 (S.D.N.Y. June 3, 1997) ("To the extent plaintiff attempts to assert new claims in his opposition papers to defendants' motion, . . . the Court finds that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment' and accordingly disregards such claims.") (citation omitted); *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 691 (S.D.N.Y. 1999).  While a complaint need not correctly plead every legal theory supporting a claim, "a plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense.  Because a failure to assert a claim until the last minute will

---

[31] Oddly, Aretakis cites New York Criminal Procedure Law § 570.54 in support of Rensselaer County being liable for failing to supervise and train Special Prosecutor Nugent.  This citation must be a mistake insofar as this section of law pertains to extraditions, which is not relevant to our litigation.

inevitably prejudice the defendant, courts . . . have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 406 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

None of the named Defendants are employees of Rensselaer County. Durivage is an employee of the Town of North Greenbush, and, under these circumstances, Rensselaer County is not a policy maker over the Town. Nor is Nugent an employee of Rensselaer County, which is a peculiarly defining element in terms of whether Rensselaer County may be liable for failure to supervise, train, or in promulgating a policy. First, as a matter of fact, Nugent was not employed as either the district attorney or an assistant district attorney, but rather as an independent contractor standing in for a recused district attorney, a salient fact for our discussion. He was appointed by a New York Supreme Court Justice to serve in the limited role of special prosecutor and for the limited purpose of handling Aretakis's criminal case, not to become the district attorney. Second, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (noting that the state plays a prominent role in the law enforcement activities of the district attorney); *c.f. Myers v. County of Orange*, 157 F.3d 66, 77 (2d Cir. 1998) (This is a narrow exception to the legal understanding that a district attorney and assistant district attorneys may be employees of the county, possibly subjecting the county to potential *Monell* liability).[32]  Third, a prosecutor is entitled to act "freely independent" when exercising his discretion to prosecute and the manner in

---

[32] *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).  A municipality may only be liable for a constitutional violation if the violation results from an official policy or custom either of the municipality's law makers or of those whose edicts or acts may be fairly said to represent official policy. *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 72 (2d Cir. 1992).  The plaintiff must demonstrate a causal link between the deprivation of a constitutional right and a specific municipal policy or custom. *Gibson v. City of New York*, 1998 WL 960303, at *4 (E.D.N.Y. Dec. 9, 1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. at 691).

how he  prosecutes a case, and "[n]o county policy can require them to act otherwise." *Baez v. Hennsessy*, 853 F.2d at 77.  Therefore, a county neither supervises nor dictates a policy over a district attorney or special prosecutor as to how a prosecutor may conduct a prosecution and, thus, cannot be liable for the  prosecutor's performance of that particular duty.  *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) (noting its ruling in *Baez v. Hennsessy*, that "a district attorney's misconduct in prosecuting an individual could not give rise to municipal liability"); *Gentile v. County of Suffolk*, 926 F.2d 142, 156 (2d Cir. 1991); *Zachary v. County of Onondaga*, 1999 WL 14041, at *2 (N.D.N.Y. Jan. 7, 1999) (citing *Baez v. Hennessy*).  However, this same rule may not apply if the prosecutor also serves as a manager and policy maker.

Nugent's special role, his decision to prosecute, and the manner in which he prosecuted the case against Aretakis are distinguishable from the line of cases that indeed imposed *Monell* liability upon the county for the managerial actions of the district attorney.  Where a district attorney acts as a manager of the district attorney's office, the district attorney acts as a county policy maker. *Gentile v. County of Suffolk*, 974 F.2d 142 (finding that a county district attorney's long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing could subject the county to liability under § 1983).  In *Walker v. City of New* York, 974 F.2d 293, the plaintiff challenged the district attorney's management of his office with regards to supervising and training assistant district attorneys on *Brady*[33] and perjury issues.  Therein, the Second Circuit found that plaintiff had stated a cause of action against the county.  Similarly, where a district attorney office had an unconstitutional policy of not allowing cross criminal complaints, the Circuit found that the plaintiff had stated a claim against the county inasmuch as the district attorney, who implemented

---

[33] *Brady v. Maryland*, 373 U.S. 83 (1963) (ruling on the disclosure of exculpatory evidence to the defense).

and enforced the policy, was an official policy maker for the county.  *Myers v. County of* Orange, 157 F.3d 76-77.

Here, Aretakis solely challenges Nugent's decision to prosecute him and how he prosecuted him, thus these facts are controlled by *Baez v. Hennessy*, 853 F.2d 73, and the recent Supreme Court decision, *Van de Kamp v. Goldstein*, _ U.S. _, 2009 WL 160430 (U.S. Jan. 26, 2009).  When there are claims alleging a failure to supervise and train regarding the conduct of a trial, legal knowledge, or the exercised of related discretion, such as plea negotiations, the supervisory prosecutors are absolutely immune as well.  *Van de Kamp v. Goldstein*, _ U.S. _, 2009 WL 160430, at *7-9.  Under any liberal interpretation of our case, there would be no policy implementations for Rensselaer County.  Morever, Nugent had no policymaking authority over either the County or the Town of North Greenbush as to how the police department investigates and the manner in which they testify.  There is not, nor can there be, a factual basis to support the claim that Nugent possessed or acted within any managerial role over anyone in this litigation.  Hence, Aretakis has failed to plead or prove a failure to train and supervise claim against either Rensselaer County or Nugent.

### 2.  Town of North Greenbush

We must now turn to the alleged *Monell* claims, pertaining to supervision and training, against the Town of North Greenbush.  Once again, looking at the third and fourth causes of action, Aretakis states that the Defendants, in the context of meaning the Town, "failed to properly train police officers and law enforcement on how to deal with a situation wherein a person was being falsely charged," and, in addition, "employed a flawed and inappropriate policy of handling and conducting investigations."  Am Compl. at ¶¶ 138 & 143.  Further, Aretakis claims that Defendants, once again, meaning the Town, evinced "deliberate indifference to the excessive use of force by its

police officers." *Id.* at ¶ 158 (fourth cause of action).

It is well-settled that a claim of negligent training or supervision under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), lies against a municipality only where there is a finding of a constitutional violation by one of its officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994). To show that a municipality, through its failure to train or supervise employees, has violated § 1983, three requirements must be met. *Walker v. City of New York*, 974 F.2d at 297. First, the municipality's policy maker must know "'to a moral certainty' that [his or] her employees will confront a given situation." *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)). Second, either the situation must present the employee with the sort of difficult decision that training or supervision would ameliorate or there is "a history of employees mishandling the situation." *Id.* Finally, it must be shown that the "wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298.

Furthermore, "the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (overruled on other grounds); *c.f. Washington v. City of New York*, 974 F.2d at 296 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), for the proposition that a single challenged act was the decision of the municipal policy maker). Evidence of an unconstitutional action by a police officer will not, on its own, be enough to prove that the training program the officer received was inadequate, let alone prove that any inadequacy was a

result of a city's deliberate indifference. *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (there must be a showing of deliberate indifference to a member of the public's rights); *Carnegie v. Miller*, 811 F. Supp. 907, 911 (S.D.N.Y. 1993). "Deliberate indifference means that the city made a 'deliberate choice' not to train its employees from among various alternatives." *Pawlicki v. City of Ithaca*, 1996 WL 705785, at *2 (N.D.N.Y. Dec. 5, 1996) (citing *Canton v. Harris*, 489 U.S. at 389). "Such deliberate indifference may be inferred from a failure to supervise: from proof of repeated complaints of constitutional violations that 'are followed by no meaningful attempt on the part of the municipality to investigate or forestall further incidents.'" *Velasquez v. City of New York*, 960 F. Supp. 776, 783 (S.D.N.Y. 1997) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). However, liability will not attach unless the training inadequacy is closely related to the ultimate injury. *Pawlicki v. City of Ithaca*, 1996 WL 705785, at *2. Plaintiff must show that he suffered a constitutional injury. *Azzam v. The Travelers Ins. Co.*, 2000 WL 151906, at *4-5 (N.D.N.Y. Jan. 28, 2000). Furthermore, a plaintiff must identify specific deficiency in any training and supervision in such a way that such deficiency "actually caused the constitutional deprivation." *Green v. City of New York*, 465 F.3d at 81 (citation omitted); *see also Jenkins v. City of New York*, 478 F.3d 76, 95 (2d Cir. 2007).

A municipality may only be liable for a constitutional violation if the violation results from an official policy or custom either of the municipality's law makers or of those whose edicts or acts may be fairly said to represent official policy. *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 72 (2d Cir. 1992). The plaintiff must demonstrate a causal link between the deprivation of a constitutional right and a specific municipal policy or custom. *Gibson v. City of New York*, 1998 WL 960303, at *4 (E.D.N.Y. Dec. 9, 1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. at 691). Plaintiff must,

however, assert facts that support a claim that he was a victim of acts undertaken pursuant to a practice equivalent to a *de facto* policy.  Conclusory allegations are insufficient to state a claim under the civil rights statutes.  *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).  Further, a plaintiff cannot establish municipal policy, custom or practice solely by inference from evidence of the occurrence of the incident in question.  *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986, *cert denied*, 480 U.S. 922 (1987).

First, a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights.  *Amato v. City of Saratoga Springs*, 170 F.3d 311, 320 (2d Cir. 1999) (cited in *Curley v. Vill. of Suffern*, 268 F.3d at 71.  "[I]f a plaintiff fails to show that a constitutional violation occurred in the suit against the individual official, the corresponding cause of action against the municipality will be mooted since a claim of negligent training is only actionable where some constitutional violation actually occurred."  *Id.* (citing *City of Los Angelos v. Heller*, 475 U.S. 796, 799 (1986)).  Here, we have determined that Durivage has not violated any of Aretakis's constitutional rights and thus  most of Aretakis's *Monell* claim against the Town has been eviscerated.

Second, Aretakis has stated neither in his Amended Complaint nor his Opposition papers a specific deficiency in the Town's police officer's training.  Something more is required because a training program is not rendered inadequate "merely because a few of its graduates deviate from what they were taught."  *Jenkins v. City of New York*, 478 F.3d at 95.  This principle further complicates Aretakis's effort to assert a *Monell* claim.

Yet, there is one *Monell* claim that, based upon an improper municipal policy practice and custom, tenuously hangs by a bare thread.  This claim may also survive a motion for summary

judgment at this stage and may require discovery of an alleged pattern of police misconduct based upon custom and practice.  The locus of this claim is not found squarely within the third and fourth causes action but on the periphery.  In the Amended Complaint's factual allegation section, Aretakis alleges "Defendants also have utilized other police officers who have threatened or targeted the Plaintiff at and after the time of the initials charges," naming specifically Sergeant Christopher Marsh and Officer Michael Merola as just a few examples of the continuing nature of the violations of his rights.  Am. Compl. at ¶¶ 73-77.  Then, in specific detail, Aretakis lists a number of offenses in his Opposition papers that the Town's police force and other officials committed against him from 2003 until February 7, 2007, ranging from failing to investigate death threats made against him, threatening him and his family, harassing him with periodic traffic stops, and selectively and unfairly targeting him on multiple occasions with prosecutions.  Aretakis Aff. at ¶¶ 38-55.  Such a cause of action can be pled if the municipality violated Aretakis's Fourteenth Amendment right to equal protection by selectively harassing him with the intent to inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure.  *Bissinger v. City of New York*, 2007 WL 2826756, at *9 (S.D.N.Y. Sept. 24, 2007) (citing *Freedom Holdings Inc., v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004)); *Yaman, v. D'Angelo*, 206 F. Supp. 2d 394, 400 (W.D.N.Y. 2002) (citing, *inter alia*, *McGee v. Hester*, 724 F.2d 89 (8th Cir. 1983) & *Rodrigues v. Vill. of Larchmont*, 608 F. Supp. 464, 474 (S.D.N.Y. 1985) for the proposition that police surveillance may become so intrusive as to violate a plaintiff's clearly established rights).

As we have cautioned above, stating further facts and pleading additional causes of action in an affidavit in opposition to dispositive motions should not be countenanced.  However, there is a frail nexus between those allegations in the Amended Complaint and those expounded upon facts

in Aretakis's Affidavit that may survive the dispositive Motions.

Although Aretakis makes numerous claims under this custom and practice theory, many of those claims cannot be pled because of the statute of limitations.  For example, the claimed series of police and other officials' misconduct allegedly commenced in 1999.  *See generally* Aretakis Aff. at ¶¶ 38-55.  As we well know, there is a three year statute of limitations for § 1983 actions.  Even if this series of events was characterized as "interlocking events," they would not postpone nor extend the time in order to bypass the statute of limitations.  "The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering a wrong for which damages may be recovered in a civil action."  *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) (quoted in *Rodrigues v. Vill. of Larmont*, 608 F. Supp. at  476 n.11); *Yaman v. D'Angelo*, 206 F. Supp. 2d at 400.  So those events that Aretakis lists from 1999 to June 5, 2004, are time barred.

Aretakis has at least pleaded the second prong of a selective treatment claim: that such treatment may have been based on a malicious or bad faith intent to injure a person.  What remains hazy is whether Aretakis can plead facts that he was treated differently from other similarly situated individuals and whether he was damaged by their alleged misconduct pursuant to a custom and practice.

Even though Aretakis has not moved to amend his Complaint in this respect, we will permit him an opportunity to amend his Complaint to more clearly state a policy of selective treatment directed at him by the Town of North Greenbush.[34]

---

[34] It must be understood that this permission to amend the Complaint is not a license to overreach and attempt to plead other causes of actions or add other parties.  That will not be allowed.  Any amendments to the Complaint are to be narrowly construed, consistent with this Memorandum-Decision and Order, in order for Aretakis to properly state a *Monell* custom and practice cause of action based upon selective treatment.

### H.  Sixth Cause of Action - Durivage's and Nugent's Negligence

Within this cause of action, Aretakis alleges that both Durivage and Nugent, for different reasons of course, were negligent and caused him injury.  Am. Compl. at ¶¶ 175-82.  Initially, we note that alleging negligence does not support a claim that a person's constitutional rights were deprived.  *Coakley v. Jaffee*, 49 F. Supp. 2d 615, 625 n.6 (citing *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996)).  More importantly, New York does not recognize an action alleging negligent investigation or negligent prosecution of a crime.  *Santiago v. City of Rochester*, 19 A.D.3d 1061, 1062 (N.Y. App. Div. 4th Dep't 2005) ("There is no cause of action in New York for negligent investigation of a crime."); *Galatowitsch v. New York City Gay & Lesbian Anti-Violence Project, Inc.*, 1 A.D.3d 137 (N.Y. App. Div. 1st Dep't 2003), *lv. denied,* I N.Y.3d 507 (N.Y. Ct. App. 2004) (no cause of action for negligently being prosecuted); *Hernandez v. State*, 228 A.D.2d 902, 903-04 (N.Y. App. Div. 3d Dep't 1996) (citing, *inter alia*, *Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 285 (N.Y. Ct. App. 1998)).  Further, a claim for negligent training in investigative procedure is akin to a claim for negligent investigation or prosecution, which, again, are not actionable in New York.  *Russ v. State Employees Federal Credit Union*, 298 A.D.2d 791, 793 (N.Y. App. Div. 3d Dep't 2002).  As a last point, Nugent is protected with absolute immunity from both negligence and intentional infliction of emotional distress since he was acting in his quasi-judicial role.  *Arteaga v. State*, 72 N.Y.2d 212, 217 n.1 (N.Y. Ct. App. 1988).  Aretakis has failed to state a cause of action sounding in negligence against Durivage and Nugent.

In typical fashion, Aretakis has taken a shotgun approach to all of the causes of action pled against these Defendants.  We remain uncertain whether Aretakis meant to plead a negligent cause of action against Wells because there are no specific factual allegations in that respect.  Nonetheless,

we can state, without further analysis, that Aretakis cannot, under these facts, state a cause of action for negligence against Wells. Within the parameters of these facts, Wells does not owe Aretakis any duty of care.

### I.  Sundry of Other Legal Issues

In his Memorandum of Law, Aretakis implies that his Eighth Amendment Rights were violated. Aretakis Mem. of Law at pp. 9 & 10. This approach is indicative of the scatter-gun approach he has pursued in stating causes of action. Nowhere within the four corners of the Amended Complaint will a reader find any recitation of an Eighth Amendment claim. The only repository for such a claim is his Memorandum of Law, which we have already illustrated, is totally improper. The suspect manner in which the Eighth Amendment has been interjected into this case belies Aretakis's understanding of constitutional matters and it is completely misplaced within the factual framework of this case. An Eighth Amendment complaint of cruel and inhuman treatment is generally applicable when a person is confined after conviction. *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003) ("After [post conviction] incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977 )); *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979)) for the proposition that because a person "lawfully committed to pretrial detention has not been adjudged guilty of any crime," pre-trial detainees "may not be punished in any manner–neither cruelly and unusually nor otherwise."); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (noting that "Eighth Amendment's protection doe not apply until after conviction and sentence") (quoting *Graham v. Connor*, 490 U.S. 386, 392

n.6 (1989)).[35]   No such event occurred here because Aretakis was acquitted and never incarcerated.

As an aside, the intentional infliction of emotional distress claim would fall because of another legal deficiency.   *See supra* Part II.D.   Under New York law, no legal action may be commenced against a municipality, and, in our case that would be the Town of North Greenbush, unless there is a timely service of a notice of claim pursuant to New York General Municipal Law §§ 50-e to 50-I.   On or about September 6, 2006, Aretakis filed an eleven page Notice of Claim. Dkt. No. 52, Ex. D.   Within that Notice of Claim, a multiplicity of claims were asserted, but intentional infliction of emotional distress was not one of them.   By failing to include intentional infliction of emotional distress within the Notice of Claim, this claim is time barred.   Accordingly, that is another reason why this cause of action cannot survive against the Town.[36]

Our final issue is whether Nugent may be awarded reasonable attorney fees pursuant to 42 U.S.C. § 1988.   The Second Circuit has fairly summarized the law as to whether a successful defendant in a § 1983 may recover his attorney fees:

> Under 42 U.S.C. § 1988(b), in any action to enforce Section 1983, a district court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."   We review a grant or denial of section 1988 fees for abuse of discretion.   *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir. 1998).   Fees are regularly awarded to prevailing plaintiffs who obtain some significant measure of relief but not to prevailing defendants.   *See, e.g., Hughes v. Rowe*, 449 U.S. 5, 15-16, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam). Instead, "a plaintiff should not be assessed his opponent's attorney's fees unless a

---

[35] Without specifics, we can only surmise that Aretakis meant to assert a cruel and inhuman claim by raising the Eighth Amendment in his Memorandum of Law.   We certainly hope that he did not mean to argue due process under this constitutional amendment.   For if he did, the claim would be fatally flawed as well.

[36] Defendant Town of North Greenbush and Durivage wish to argue that the cause of action for intentional infliction of emotional distress is further weakened by the one year statute of limitations. N.Y.C.P.L.R. § 215.   However, we are not able to determine when this cause of action accrued.   Did it accrue when Aretakis was arrested on September 16, 2005, or did the violation continue until his trial was concluded on June 9, 2006?   Without knowing when this action may have accrued, we are unable to calculate the statute of limitations.   Nonetheless, there is no need for us to analyze this matter further.

court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). A prevailing defendant need not show bad faith by a plaintiff to be entitled to attorneys' fees, though such a showing provides "an even stronger basis" for the award. *Id.*

*Panetta v. Crowley,* 460 F.3d 388, 399 (2d Cir. 2006).

Nugent's task in support of his application for reasonable attorney fees from Aretakis is to show that the action, as to him was frivolous, unreasonable, groundless, or that the plaintiff continued to litigate after it became obviously so. We find that Nugent has met this burden. It is seminal law that a prosecutor acting within his quasi-judicial capacity is entitled to absolute immunity. Not only is this apparent from facts of the case, but the Court made this rule of law evidently clear during the Rule 16 Conference. In order to frame a set of circumstances outside the contours of absolute immunity, Aretakis unreasonably contorted the boundaries of Nugent's actions in prosecuting this matter so that they may fall within an administrative or investigatory function. Both Aretakis and Cholakis, who both claim to be experienced lawyers, made unfounded, even scurrilous, accusations about Nugent's conduct and proposed that Nugent's *raison d'etre* was to uphold the Catholic Church's conspiracy against him and to injure him. Without any foundation whatsoever, especially in the face of Judge Toomey's on-the-record denial that Attorney Roche made any negative comments about Aretakis, he nonetheless cleaved to the spurious supposition that Roche was assigned the telephone task by Nugent in order to prejudice Aretakis. Not one iota of fact was alleged to support this specious argument, only a mere coincidence.

Under these circumstances, we find that Nugent is entitled to reasonable attorney fees. He is directed to submit a more detailed application for attorney fees and costs.

### III.  CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that Robert Wells's Motion to Dismiss, Dkt. No. 50, is **granted** and he is dismissed from this action; and it is further

**ORDERED**, that Timothy Nugent's Motion to Dismiss and/or Summary Judgment, Dkt. No. 53, is **granted** and he is dismissed from this action; and it is further

**ORDERED**, that Robert Durivage's and the Town of North Greenbush's Motion to Dismiss and/or Summary Judgment, Dkt. No. 52, is **granted in part** and **denied in part**.  All causes of action against Durivage and the Town of North Greenbush are dismissed except the cause of action against the Town of North Greenbush alleging a *Monell* claim based upon the alleged municipal policy, practice, and custom of selective treatment of Aretakis in that the Town failed to investigate threats made against the Plaintiff, threatened the Plaintiff and his family, targeted and harassed Plaintiff, and unfairly targeted him on multiple occasions with prosecution.  *See supra* pp. 60-62. Such claims are only asserted against the Town and therefore Durivage is dismissed from this action; and it is further

**ORDERED**, that John Aretakis may serve and file a Second Amended Complaint consistent with this Memorandum-Decision and Order, within ten days of the filing date of this Order; and it is further

**ORDERED**, that Timothy Nugent is the prevailing party as to his dispositive motion and we find that Aretakis's Amended Complaint as to Nugent is frivolous and groundless.  Nugent is directed to serve and file an application for reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988, within twenty days of the filing date of this Order.

**IT IS SO ORDERED**.

February 3, 2009
Albany, New York

_____

RANDOLPH F. TREECE
United States Magistrate Judge